[892 NYS2d 60]

In the Matter of L&M Bus Corp. et al., Respondents-Appellants,
v New York City Department of Education et al.,
Appellants-Respondents, and Local 1181 of the Amalgam-
ated Transit Union, Intervenor-Appellant.

First Department, December 22, 2009

128

### APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Dona B. Morris, Francis F. Caputo, Andrew Gelfand, Michael Adler* and *Eric P. Jewell* of counsel), for appellants-respondents.

*Meyer, Suozzi, English & Klein, P.C.*, New York City (*Richard A. Brook, Richard N. Gilberg, Robert Marinovic* and *Melissa S. Woods* of counsel), for appellant.

*Wasserman Grubin & Rogers, LLP*, New York City (*John F. Grubin* and *James Joyce* of counsel), for respondents-appellants.

### OPINION OF THE COURT

Tom, J.

At issue on this appeal is the propriety of a request for bids (RFB) issued by respondent New York City Department of

Education (DOE). The RFB invites bids for providing transportation between home and school to handicapped children participating in pre-K and early intervention (EI) programs.* Bids are required to be submitted "on a per rider per day basis" so that DOE can track transportation costs per child for purposes of its own reimbursement.

DOE solicited bids on a five-year contract to transport participants to program sites, not necessarily located in the same borough, based on what can only be described as a very rough estimate of the number of participants, an inexact description of their location or the frequency and level of transportation required, and no guarantee that any of these factors will remain stable over time. The contract, terminable at DOE's option, contains employee protection provisions (EPPs) and provides that any contract vendor who needs new employees is required to hire workers laid off by a competitor at the workers' same rate of pay and to maintain welfare and pension contributions. The contract also provides DOE with a 2% discount for timely payment and vendors with increased reimbursement as the result of a reduction in the number of children transported, but only if the decrease exceeds 30% of ridership.

This petition under CPLR article 78 was brought by 23 prospective bidders seeking a declaration that various provisions contained in the RFB violate the public bidding law. Petitioners contended that the RFB is anticompetitive because the inclusion of EPPs renders the calculation of a bid impossible; the bid specification permits adding and dropping schools, programs and participating children without a commensurate reimbursement adjustment; the RFB fails to provide the addresses of participating children; and the 2% reduction for prompt payment is confiscatory, providing for the imposition of what amounts to a 2% fee whether or not a vendor participates in DOE's electronic payment system, for which the fee is imposed. To assist in preparation of their bids, petitioners sought to require DOE to provide "the addresses of all children presently at the schools to and from which children are to be bused."

In their answer, respondents averred that "EPPs (1) ensure labor peace, and, thus, contractual performance without disruption; (2) facilitate the use of proven, experienced workers; and (3) remove a major impediment to bidding (pension 'withdrawal

---

* Children in the pre-K program are between three and five years of age and those in the EI program are less than four years of age.

liability')." With respect to petitioners' request for the addresses of the children to be transported, respondents did not contend that disclosing such information would offend federal privacy laws.

Local 1181 of the Amalgamated Transit Union was granted leave to intervene. The union moved to dismiss the petition for failure to state a cause of action insofar as it sought to bar the inclusion of EPPs. In the alternative, the union sought leave to conduct discovery.

Supreme Court, inter alia, granted so much of the petition as sought to strike the EPPs as contrary to the public purpose embodied in the competitive bidding statute and directed that DOE provide the addresses of participating children. It also mandated the removal or revision of provisions that it found merely promote the inflation of bids, specifically, a provision limiting the increase in vendor reimbursement to those contractors experiencing a greater than 30% drop in ridership and the provision for a 2% early payment discount.

Due to the complexity of the bid specifications and the uncertainty resulting from the inability to predict likely revenues and anticipate costs, we agree with Supreme Court's disposition. The RFB provides that transportation is to be provided under a "requirements contract" for the five-year period from July 1, 2008 through June 30, 2013, with two one-year extensions at DOE's option. Contractors are to "supply transportation service from anywhere in the City to all eligible program participants attending sites within [a particular geographic] zone . . . It is [DOE's] intention . . . that the successful bidders . . . will assume responsibility for any new work that should arise in their geographic zones after July 1, 2008."

Payment to a contractor for transportation provided to a participating child varies according to which of six "categories" the child is assigned. Classification depends on the program in which the child is registered (pre-K or EI), whether the child resides in the same or a different borough as the program site and, for the older EI participants, whether the child is ambulatory or not. The RFB specifies that "children who reside in and are provided services in the same borough should not spend more than one hour on the run each way," and "children who reside in one borough and receive services in another borough or county should not spend more than one and one-half hours on the run each way." Price adjustments for labor and fuel costs over the life of the contract are provided based on the rate of inflation.

The RFB presents a considerable challenge to potential bidders due to the complexity in ascertaining the extent of the transportation services to be supplied. Bids are solicited for "classes" delineated by the geographic zones in which the various pre-K and EI service sites are located. The intricacy of estimating a bid for a particular class is compounded by the uncertainty as to the number of participating children within the particular zone who are included in each of the six categories. Section 4.2 of the RFB states that DOE "shall provide each bidder with the weighting proportion of each category of service expected in each class. In addition, [DOE] shall indicate the estimated number of children to be served in each service category." However, section 1.18 warns that DOE's

> "estimate of the number of children requiring transportation is only an approximation . . .

> "The number of children actually requiring transportation may be less or more than so estimated, and if so, the service must be provided as offered and no claim, action or change order for damages or loss of profits shall accrue to the Contractor by reason thereof.

> "Vendors cannot refuse to deliver the . . . services or cancel the contract if quantities exceed or fall short of any estimated quantity."

On the other hand, section 4.4 states the contract may be amended if DOE "is required to add riders in categories with zero expected riders in the RFB."

Section 4.9 states that DOE "does not guarantee, nor may the Contractor rely upon, the durable stability of any schedules for particular children or service sites." Furthermore, "Individual children may be scheduled . . . for as few as one daily session per month, or more than five daily sessions per week, or any number of daily sessions in between."

Section 4.10 (A) provides that "the number of children to be transported and/or sites served by the Contractor" may be reduced at any time, with an attendant reduction in the contractor's compensation. Section 4.10 (B) "reserves the right to increase the number of individuals receiving transportation services and/or sites served by the Contractor," obligating the contractor to supply any additional vehicles as may be necessary to accommodate the additional ridership. An amendment adds:

"DOE will negotiate a price adjustment per child based on real per capita cost increases resulting from the loss of ridership if there is a drop in total ridership in a class . . . to less than 70% of the estimated ridership specified in the RFB. Should the ridership . . . at a later date increase above the 70%, pricing will revert back to the original bid price."

Added to the difficulty of determining the extent of transportation services to be provided is the uncertainty surrounding the individual contractor's responsibility for labor costs. The contract under which services are to be rendered incorporates employee protection provisions that obligate a contractor to assume the payroll costs for workers hired by a competitor and ultimately laid off. Section 4.24 of the RFB provides:

"There shall be established two industry-wide Master Seniority Lists . . . One MSL shall be composed of all pre-kindergarten operators (drivers), mechanics, and dispatchers; and the other MSL shall be composed of pre-kindergarten attendants (escorts-matrons) who were employed as of June 30, 2008, under a contract between their employers and [DOE] . . . who are furloughed or become unemployed as a result of loss of contract or any part thereof by their employers . . . in accordance with their date of entry into the pre-kindergarten school bus industry."

Thus, any existing contractors who need to hire new employees and any new contractors providing transportation services are required to hire from the MSLs, to pay such employees the same compensation they received from their previous employers, and to make, on their behalf, the same welfare and pension contributions as made by the previous employer.

Finally, the RFB introduces some uncertainty with respect to the amount to be received for services rendered by the successful bidder. Section 1.35 states that DOE "shall have the right to deduct two percent . . . from the adjusted invoiced amounts the Contractor submits if payment is made within thirty . . . days from each date [DOE] . . . shall have received an invoice," raising the question of whether the vendor should base its bid on the gross amount or the reduced amount provided where prompt payment is forthcoming.

■ Supreme Court properly struck the employee protection provisions on the ground that respondents failed to demon-

strate a rational relationship between the EPPs and the public interest promoted by the competitive bidding statute. The court concluded that, contrary to public policy, the EPPs serve to inflate bids to provide transportation services for pre-K and EI participants, reasoning that experience has shown that the costs associated with EPPs outweigh any public benefit.

General Municipal Law § 103 (1) requires that "all contracts for public work . . . be awarded . . . to the lowest responsible bidder," and Family Court Act § 236 (3) (b), which governs the busing of children participating in EI programs, states that transportation "shall be provided . . . as part of a contract awarded to the lowest responsible bidder in accordance with the provisions of" General Municipal Law § 103. Because pre-K contracts are awarded together with EI contracts, they are likewise subject to competitive bidding. While requirements that increase the cost of providing services, and thus elicit higher bids, are not precluded, "procedures having an anticompetitive effect on the bidding process can be justified only by proof that they are designed to save the public money by causing contracts to be performed at smaller cost or without disruption" (*Matter of Council of City of N.Y. v Bloomberg*, 6 NY3d 380, 392 [2006]). The EPP provisions at issue raise the prospect that a vendor will be required to assume a competing contractor's labor costs, requiring that the vendor's bid reflect not only the known expense of compensating its own employees but also the unknown and potentially much greater expense of compensating a competitor's employees. The associated risk might well dissuade a prospective vendor from bidding altogether—particularly small, low-cost vendors, for whom the expense of hiring an additional employee represents a proportionally greater burden than it would present to a large, high-wage vendor. Clearly, EPPs do not promote cost savings.

The union's argument that the EPPs are justifiable because they avert strikes is uncompelling. The concept of an EPP is closely akin to a project labor agreement (PLA), which "is a prebid contract between a construction project owner and a labor union (or unions) establishing the union as the collective bargaining representative for all persons who will perform work on the project" (*Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.*, 88 NY2d 56, 65 [1996]). A PLA typically "provides that only contractors and subcontractors who sign a prenegotiated agreement with the union can perform project work" (*id.*). "By comprehensively

requiring all bidders to conform to a variety of union practices and limiting their autonomy to negotiate employment terms with a labor pool that includes nonunion workers[,] . . . PLAs have an anticompetitive impact on the bidding process" (*id.*).

The Court went on to

> "identify two central purposes of New York's competitive bidding statutes, both falling under the rubric of promoting the public interest: (1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts" (*id.* at 68).

To be considered valid, any specification that deters competition in bidding for public work is required to bear a rational relationship to these two goals. But where the particular bid specification is a PLA, which is distinguished by its comprehensiveness and anticompetitive impact, a public authority bears an enhanced burden, to wit, its

> "decision to adopt such an agreement for a specific project must be supported by the record; the authority bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes. Judicial review, although limited, is not without importance in that it safeguards the interests protected by the competitive bidding mandate. PLAs may not be approved in a pro forma manner" (*id.* at 69).

Though respondents and the union attempt to distinguish EPPs to remove them from these principles, the anticompetitive impact resulting from the restriction of the vendors' autonomy to hire nonunion workers subjects these arrangements to the same scrutiny applied to PLAs. Respondents' assertion that the EPPs will avoid strikes is not supported by the record. As noted, "*Post hoc* rationalization for the agency's adoption of a PLA cannot substitute for a showing that, prior to deciding in favor of a PLA, the agency considered the goals of competitive bidding" (*id.* at 75) by, for instance, obtaining an expert's estimate of the costs to be avoided. The record is devoid of evidence that respondents considered the goals of competitive bidding before deciding to insert EPPs into the bid specification, and Supreme Court properly struck the provisions from the RFB.

▪ The union's contention that it should have been granted permission to supplement the record in this regard is of no mo-

ment. It is settled that a court's review of the propriety of an agency's determination is confined to the particular grounds invoked by the agency in support of its action (*see Matter of Yarbough v Franco*, 95 NY2d 342, 347 [2000]; *Matter of Montauk Improvement v Proccacino*, 41 NY2d 913, 913-914 [1977]); neither evidence nor arguments outside the administrative record may be considered (*Brusco v New York State Div. of Hous. & Community Renewal*, 170 AD2d 184, 185 [1991], *appeal dismissed* 77 NY2d 939 [1991], *cert denied* 502 US 857 [1991]). The union does not identify any statute or regulation that provides a basis upon which the record before the administrative agency can be supplemented (*cf. Matter of Rizzo v New York State Div. of Hous. & Community Renewal*, 6 NY3d 104, 110-111 [2005]). In the absence of such a provision, denial of the union's motion for leave to conduct discovery (CPLR 408) was well within the provident exercise of the court's "considerable discretion" (*Matter of Grossman v McMahon*, 261 AD2d 54, 57 [1999]; *see also Matter of Shore*, 109 AD2d 842 [1985]).

▪ Supreme Court appropriately directed DOE to provide more accurate information concerning the location from which participating children are to be transported. The lack of detail in the specification operates to inflate the bids solicited. As the court explained, the number of buses required to transport children from a given neighborhood depends on the proximity of the children to each other and to their respective schools. Unless their location is known with reasonable accuracy, a contractor might seriously underestimate the number of buses needed to transport children to a school located in a particular zone. If the contractor estimates that three buses should be sufficient and later discovers that six are required, DOE is not obligated to increase the contractor's per pupil reimbursement rate, which merely prompts the contractor to submit a bid reflecting a higher rate per pupil to guard against the possibility of significantly higher actual transport costs.

▪ The court also properly struck those provisions that limit increases in reimbursement to those vendors experiencing a greater than 30% drop in ridership. The court struck those portions of section 4.10 of the RFB as provide for the increase or decrease in ridership without any adjustment in compensation as anticompetitive, noting that, as written, the provision "causes contractors to inflate their bids by 30% to cover this eventuality," defeating the goal of the public bidding law that services be obtained at the lowest possible price (2008 NY Slip Op 33597[U], *35).

Such provisions discourage vendors from bidding or prompt them to submit inflated bids (*see e.g. Hart v City of New York*, 201 NY 45, 53-55 [1911]; *Matter of Sagamore Auto Body v County of Nassau*, 104 AD2d 818, 821 [1984]; *see also Brooklyn Ash Removal Co., Inc. v O'Brien*, 238 App Div 647 [1933]). As observed over a century ago, "Competition is not fostered by a clause reserving the right to change the material and work without any limitation" (*Gage v City of New York*, 110 App Div 403, 420 [1905] [emphasis omitted]).

Because the per-child/per-trip transportation cost eludes determination as a result of the uncertainty of the RFB specifications, this matter is readily distinguishable from *Matter of McNutt Co. v Eckert* (257 NY 100 [1931]), relied upon by respondents. That case involved a needs or requirements contract, in which the vendor undertook to supply as many desks as the Board of Education might require during the year at the per-unit cost stated in its bid. Although the Board failed to supply any estimate of the number of desks that would be needed, the Court noted, "A contract obligating a party to furnish all the materials required during a certain period, deliveries to be made as needed, is a valid and enforceable contract" (*id.* at 106). Indeed, such long-term contracts to supply goods are common in certain industries (*e.g. Laclede Gas Co. v Amoco Oil Co.*, 522 F2d 33 [8th Cir 1975] [propane]; *Eastern Air Lines, Inc. v Gulf Oil Corp.*, 415 F Supp 429 [SD Fla 1975] [aviation fuel]). The only variable in such arrangements is the quantity of the product to be supplied, the price of which can be determined from the market. Where, as here, the contract involves the provision of a service, the cost of which is dependent on a number of largely unknown variables, the exercise becomes speculative (*Hart*, 201 NY at 51 [indefinite description precludes effective competition of bidders "on a common basis of work to be done and materials furnished"]; *Brooklyn Ash Removal Co.*, 238 App Div at 650 [indefinite and uncertain specifications]).

■ The court properly required removal of the 2% early payment provision of section 1.35. It stated, "This provision encourages bidders to inflate their bid prices by 2% to anticipate the eventuality that DOE will deduct 2% from its invoices. Such an increase in the bid, unrelated to the services to be provided, contravenes the goal of securing quality services for the lowest possible price." (2008 NY Slip Op 33597[U] at *41.) We agree that, as concerns this provision, 2% is merely an arbitrary

amount having no relationship to the services to be provided and promotes a commensurate inflation of the bid price.

It should be noted, however, that a related provision, contained in section 1.35.1 of the contract, which includes a 2% service fee for payments received within 15 days, is unaffected by Supreme Court's ruling. Unlike the mandatory provisions of section 1.35, section 1.35.1 concerns a vendor's voluntary participation in an electronic payment system. As petitioners state, they "never challenged the voluntary program encompassed in § 1.35.1, but only the involuntary confiscation provided for in § 1.35." Thus, this provision was not at issue before Supreme Court and is not affected by its ruling.

■ The court properly left section 1.5 (A) in the RFB. Petitioners cite no cases where a termination-for-convenience clause was found to violate the public bidding law. In any event, where an agency has the right to terminate an agreement without cause, the decision to terminate may not be made in bad faith and is subject to review under CPLR article 78 (*Matter of RX 2000 v DeBuono*, 261 AD2d 162, 163 [1999]).

■ Under the circumstances, we find that respondents may raise, for the first time on appeal, arguments regarding the addresses they were ordered to supply (*see e.g. Chateau D' If Corp. v City of New York*, 219 AD2d 205, 209 [1996], *lv denied* 88 NY2d 811 [1996]). Since petitioners concede that disclosure of "the addresses of all children presently at the schools to and from which children are to be bused" is overbroad, we direct that the matter be remanded to DOE for further proceedings in accordance with Supreme Court's opinion (*see e.g. Burke's Auto Body v Ameruso*, 113 AD2d 198, 200-201 [1985]). In order to disclose specific addresses, DOE would have to go through a cumbersome procedure (*see* 20 USC § 1232g [a] [5] [B]; 34 CFR 99.37). Moreover, while petitioners persuasively contend that mere zip codes will not allow a reasonable assessment of the number of buses required to service a particular geographic zone, they state that identifying the cross streets between which pupils live will be sufficient for this purpose.

Accordingly, the order of the Supreme Court, New York County (Carol Edmead, J.), entered on or about December 17, 2008, which, to the extent appealed from, declared sections 1.35 and 4.24 and parts of section 4.10 of request for bids BO553 unlawful, declined to hold section 1.5 (A) unlawful, ordered respondents to include "the addresses of all children presently at the schools to and from which children are to be bused" in a

revised specification (2008 NY Slip Op 33597[U] at *47), and implicitly denied intervenor's motion to compel respondents to complete the record, should be modified, on the law, such portion of the order as requires disclosure of children's addresses vacated, the matter remanded to respondents for further proceedings in accordance with this opinion, and otherwise affirmed, without costs. Petitioners' purported cross appeal from an order, same court and Justice, entered on or about April 9, 2008, which granted intervenor's motion for leave to intervene, and/or from an order, same court and Justice, entered May 16, 2008, which, upon granting petitioners' motion for reargument, adhered to its April 9 decision, should be dismissed, without costs, as those nonfinal orders are not brought up for review on this appeal from the December 17, 2008 order.

Motion seeking sanctions denied.

GONZALEZ, P.J., ANDRIAS and SAXE, JJ., concur.

Order, Supreme Court, New York County, entered on or about December 17, 2008, modified, on the law, such portion of the order as requires disclosure of children's addresses vacated, the matter remanded to respondents for further proceedings in accordance with this opinion, and otherwise affirmed, without costs. Petitioners' purported cross appeal from an order, same court, entered on or about April 9, 2008, and order, same court, entered May 16, 2008, dismissed, without costs, as those nonfinal orders are not brought up for review on this appeal from the December 17, 2008 order. Motion seeking leave for sanctions denied.