[950 NE2d 915, 927 NYS2d 311]

In the Matter of L&M Bus Corp. et al., Respondents, v New York City Department of Education et al., Appellants, and Local 1181 of the Amalgamated Transit Union, Intervenor-Appellant.

Argued May 3, 2011; decided June 14, 2011

**POINTS OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel,* New York City
*(Dona B. Morris, Francis F. Caputo, Nancy F. Brodie* and *Michael Adler* of counsel), for appellants. I. The Employee Protection Provisions comport with competitive bidding laws by safeguarding against disruption of contractual performance, promoting the use of a proven and competent labor force, and removing a barrier that would otherwise depress the pool of interested bidders. *(Matter of American Tel. & Tel. Co. v State Tax Commn.,* 61 NY2d 393; *Matter of Procaccino v Stewart,* 32 AD2d 486, 25 NY2d 301; *Matter of Positive Transp. v City of N.Y. Dept. of Transp.,* 183 AD2d 660; *Matter of C. K. Rehner, Inc. [City of New York],* 106 AD2d 268; *Abco Bus Co. v Macchiarola,* 52 NY2d 938, 75 AD2d 831, 454 US 822; *Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.,* 88 NY2d 56; *Matter of Council of City of N.Y. v Bloomberg,* 6 NY3d 380; *Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth.,* 66 NY2d 144; *Jered Contr. Corp. v New York City Tr. Auth.,* 22 NY2d 187; *Associated Bldrs. & Contrs. v City of Rochester,* 67 NY2d 854.) II. The New York City Department of Education has broad discretion in creating bid specifications for bus transportation for prekindergarten and early intervention program participants. Accordingly, the courts below improperly annulled certain rational and lawful provisions of the bid specifications. *(Matter of Acme Bus Corp. v Board of Educ. of Roosevelt Union Free School Dist.,* 91 NY2d 51; *Wells v Alexandre,* 130 NY 642; *New York Cent. Iron Works Co. v United States Radiator Co.,* 174 NY 331; *HML Corp. v*

*General Foods Corp.*, 365 F2d 77; *Matter of McNutt Co. v Eckert*, 257 NY 100; *Hart v City of New York*, 201 NY 45; *Brooklyn Ash Removal Co., Inc. v O'Brien*, 238 App Div 647; *Matter of Suburban Restoration Co. v City of New York*, 290 AD2d 378; *Grace v Scott*, 125 Misc 660, 214 App Div 792; *Business Relocation Servs., Inc. v City of New York*, 19 Misc 3d 1114[A], 2008 NY Slip Op 50681[U].)

*Meyer, Suozzi, English & Klein, P.C.*, New York City (*Richard A. Brook, Richard N. Gilberg, Robert Marinovic* and *Melissa S. Woods* of counsel), for intervenor-appellant. The Appellate Division erred by holding that the Employee Protection Provisions violate applicable competitive bidding laws. (*Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.*, 88 NY2d 56; *Matter of Council of City of N.Y. v Bloomberg*, 6 NY3d 380; *Matter of Kayfield Constr. Corp. v Morris*, 15 AD2d 373; *Matter of Albany Specialties v County of Orange*, 240 AD2d 739; *American Inst. for Imported Steel v Office of Gen. Servs. of State of N.Y.*, 47 AD2d 118, 38 NY2d 991; *Matter of Warren Bros. Co., Div. of Ashland Oil & Ref. Co. v Craner*, 30 AD2d 437; *Gerzof v Sweeney*, 16 NY2d 206; *Matter of General Contrs. Assn. of N.Y. v Tormenta*, 259 AD2d 177.)

*Wasserman Grubin & Rogers, LLP*, New York City (*John F. Grubin* and *James Joyce* of counsel), for respondents. I. The courts below properly enjoined the New York City Department of Education's utilization of specifications that prevented rational bids. (*Hart v City of New York*, 201 NY 45; *Brooklyn Ash Removal Co., Inc. v O'Brien*, 238 App Div 647; *Matter of Sagamore Auto Body v County of Nassau*, 104 AD2d 818; *Matter of McNutt Co. v Eckert*, 257 NY 100; *Wells v Alexandre*, 130 NY 642; *New York Cent. Iron Works Co. v United States Radiator Co.*, 174 NY 331; *Gage v City of New York*, 110 App Div 403; *Matter of Council of City of N.Y. v Bloomberg*, 6 NY3d 380; *Matter of General Contrs. Assn. of N.Y. v Tormenta*, 259 AD2d 177.) II. The courts below properly struck the New York City Department of Education's "right" to confiscate 2% of bills it pays within 30 days, a right which serves no public bidding interest and tilts the process toward big School-Age contractors. (*Kerr-McGee Chem. Corp. v Harris*, 442 F2d 1109.) III. The courts below properly struck Employee Protection Provisions that were imposed neither to save the public money nor to prevent favoritism, improvidence, fraud, or corruption in the award of public contracts. (*Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.*, 88 NY2d 56;

*Matter of M. Cristo, Inc. v State of N.Y. Off. of Gen. Servs.*, 42
AD2d 481; *Matter of Albany Specialties v County of Orange*, 240
AD2d 739; *Van-Go Transp. Co., Inc. v New York City Bd. of
Educ.*, 53 F Supp 2d 278; *National Woodwork Mfrs. Assn. v
NLRB*, 386 US 612; *Matter of Council of City of N.Y. v
Bloomberg*, 6 NY3d 380; *Matter of Empire State Ch. of Associ-
ated Bldrs. & Contrs. v Board of Educ. of City of Buffalo*, 269
AD2d 801; *Matter of Positive Transp. v City of N.Y. Dept. of
Transp.*, 183 AD2d 660; *Matter of Bay Harbour Elec. v County
of Chautauqua*, 210 AD2d 919; *Matter of Long Is. Signal Corp.
v County of Nassau*, 51 Misc 2d 320.)

### OPINION OF THE COURT

Chief Judge LIPPMAN.

This appeal asks us to decide whether certain specifications
in the bid solicitation of the New York City Department of
Education (DOE) for a school transportation contract comport
with the public bidding laws. We conclude that the "Employee
Protection Provisions" (EPPs) contained in the solicitation are
subject to heightened scrutiny, and hold that DOE has not
proven that the EPPs are designed to save the public money,
encourage robust competition, or prevent favoritism. However,
we apply rational basis review to the remaining disputed bid
specifications and hold that DOE's actions regarding the pricing
of school transportation and discounted payment arrangements
are rational business judgments that lie within DOE's discre-
tion.

## I.

Prior to 1979, the Board of Education of the City of New York
(the Board) administered "Special Education" and "General
Education" contracts with private bus companies for the
transport of disabled children and the general population of
school-aged children to their respective schools. Contracts were
awarded pursuant to the competitive bidding procedure under
Education Law § 305 (14) and included a provision requiring
"replacement" contractors to give hiring priority, according to
seniority, to employees of private bus companies who lost their
jobs as a result of the change in contractor. When the Board at-
tempted to exclude this provision from certain bid solicitations,
members of Local 1181-1061, Amalgamated Transit Union,
AFL-CIO (Local 1181) went on strike.

Following a court-ordered arbitration, the Board, Local 1181,
and major bus companies entered a settlement, which required

the 1979 contracts to include certain EPPs in the specifications. In particular, the EPPs established a master seniority list, requiring contractors with the Board to give priority in hiring to employees on the list when such employees become unemployed because of reassignment of busing contracts. The New York City Department of Transportation (DOT), however, had at the same time been administering transportation contracts for young children in the prekindergarten (Pre-K) and early intervention (EI) programs by competitive, sealed bidding, without such EPPs.

In 2006, DOT transferred its Pre-K and EI contracts to DOE. Local 1181, which represents approximately 325 drivers and escorts who work for Pre-K and EI bus companies, requested that DOE include the EPPs in its solicitation for contract bids. DOE agreed, and the solicitation provided that

> "[a]ny new contractors, *i.e.*, those who did not provide service pursuant to contract expiring June, 2008 . . . shall give priority in employment in July, 2008 or thereafter on the basis of seniority to every operator (driver), mechanic, dispatcher and attendant (escort-matron) performing service pursuant to such contract starting from the first employee from the [master seniority list] until such [master seniority list is] exhausted" (Bid Solicitation § 4.24.1.3).

A similar provision applied to existing contractors (*see id.* § 4.24.1.2).

DOE invited bids for providing transportation between home and school to handicapped children participating in Pre-K and EI programs. Bids were required to be submitted "on a per rider per day basis" so that DOE could track transportation costs per child for purposes of its own reimbursement. DOE solicited bids on a five-year contract to transport participants to schools, not necessarily located in the same borough, based on an estimate of the number of participants and the frequency and level of transportation required at any given time. The contract also provided DOE with a 2% discount for timely payment and vendors with increased reimbursement in the event of a reduction in the number of children transported—but only if the decrease were to exceed 30% of ridership.

Petitioners, 23 transportation vendors, commenced this CPLR article 78 proceeding to prevent DOE from implementing the

allegedly illegal bid solicitation. Petitioners asserted that the requirement that bids be submitted "on a per rider per day basis" created such grave uncertainties, that potential bidders would submit speculative bids, risk substantial economic harm, or not bid at all. Moreover, petitioners urged that inclusion of EPPs would cause bidders to inflate their bids to protect against the unknown costs of giving priority to whichever employees from the master seniority list were unemployed after the DOE awarded the contracts. Likewise, petitioners claimed that the failure to include in the solicitation the addresses or boroughs of children to be bused, as had been included in DOT's prior solicitation, prevented bidders from calculating costs. Petitioners also sought revision or removal of nine specific provisions of the solicitation. Local 1181 was granted leave to intervene and moved to dismiss for failure to state a cause of action insofar as petitioners sought to bar the inclusion of EPPs.

As relevant to this appeal, Supreme Court granted the petition to the extent of declaring the following bid specifications unlawful: (i) section 4.24, "Employee Protection Provisions"; (ii) section 1.100 (B), regarding DOE's right to change the service requirements in the Contractor's Manual at any time without prior notice; (iii) section 4.10, to the extent it permitted DOE to add entire schools and programs in the vendors' service requirements without adjusting the vendors' prices; (iv) section 4.10, to the extent it provided for a price adjustment only in the event of a loss of ridership in excess of 30%; (v) section 1.48, "Liquidated Damages"; and (vi) section 1.35, 2% discount for DOE for "prompt payment" (2008 NY Slip Op 33597[U]). Supreme Court additionally ordered DOE to include in the specifications the addresses of children who currently participated in Pre-K/EI busing.[1]

The Appellate Division affirmed the relevant aspects of Supreme Court's order (*Matter of L&M Bus Corp. v New York City Dept. of Educ.*, 71 AD3d 127 [1st Dept 2009]). Discussing the uncertainty inherent in various provisions of the bid specifications, the court observed that the solicitation "presents a

---

1. In the original bid specifications, DOE did not provide any information about the location of current participating students' addresses. Petitioners sought this information in the courts below and Supreme Court ordered that DOE provide the addresses. The Appellate Division modified the order and instead required DOE to provide the cross streets of the participating children (*see* 71 AD3d 127, 138-139 [1st Dept 2009]). The parties have since settled this dispute; accordingly the issue is no longer before this Court.

considerable challenge to potential bidders due to the complexity in ascertaining the extent of the transportation services to be supplied" (*id.* at 132) and that further difficulty arises in "the uncertainty surrounding the individual contractor's responsibility for labor costs" (*id.* at 133). In striking the EPPs, the court reasoned, "the anticompetitive impact resulting from the restriction of the vendors' autonomy to hire nonunion workers subjects these arrangements to the same scrutiny applied to [project labor agreements]" (*id.* at 135).

We granted leave to appeal (15 NY3d 889 [2010]) and now modify the Appellate Division order.

## II.

General Municipal Law § 103 (1) mandates that "all contracts for public work . . . be awarded . . . to the lowest responsible bidder." Education Law § 305 (14) and Family Court Act § 236 (3) (b), which governs the busing of children participating in EI programs, similarly require that transportation contracts be awarded to the lowest responsible bidder.[2] Dual aims underlie these requirements: "(1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts" (*Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.*, 88 NY2d 56, 68 [1996] [hereinafter *New York State Chapter*]).

■ DOE contends that the Appellate Division erred by applying to EPPs the heightened standard of review used to evaluate Project Labor Agreements (PLAs). A PLA is "a prebid contract between a construction project owner and a labor union (or unions) establishing the union as the collective bargaining representative for all persons who will perform work on the project" and typically "provides that only contractors and subcontractors who sign a prenegotiated agreement with the union can perform project work" (*id.* at 65). Consistent with the goals of public bidding laws, we held in *Matter of Council of City of N.Y. v Bloomberg* (6 NY3d 380 [2006] [hereinafter *Council v Bloomberg*]) that "PLAs and other procedures having an anticompetitive effect on the bidding process can be justified only by proof that they are designed to save the public money by

2. Because Pre-K contracts are awarded together with EI contracts, they are equally subject to the competitive bidding laws.

causing contracts to be performed at smaller cost or without disruption" (*id.* at 392).

In *New York State Chapter* (88 NY2d at 65), we ruled that the features of PLAs that trigger heightened scrutiny are their atypical nature and comprehensive scope:

> "Generally, when a public entity adopts a specification in the letting of public work that impedes the competition to bid for such work, it must be rationally related to these twin purposes. Where it is not, it may be invalid [citing *Associated Bldrs. & Contrs. v City of Rochester*, 67 NY2d 854, 855 (1986)].
>
> *"As applied particularly to PLAs, which are clearly different from typical prebid specifications in their comprehensive scope, more than a rational basis must be shown.* The public authority's decision to adopt such an agreement for a specific project must be supported by the record; the authority bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes. Judicial review, although limited, is not without importance in that it safeguards the interests protected by the competitive bidding mandate. PLAs may not be approved in a pro forma manner" (*New York State Chapter*, 88 NY2d at 68-69 [emphasis added]).

Hence, we distinguish between common specifications that, while challenged as having an anticompetitive effect, are not anticompetitive on their face, and atypical ones that are patently restrictive. Even common specifications, like construction materials or design criteria (*see id.* at 65) may impede competition by excluding those who cannot meet them. For example, a bid specification that requires that a contractor only use a certain shade of paint may not be anticompetitive on its face. But, if a bidder challenges the requirement on the ground that only one store in the area sells the particular shade of paint and the store exclusively sells that paint to one of the bidders, then the public entity will have to show a rational basis on review in order for the specification to withstand the challenge. Unlike a specification designating the color of paint to be used in a public works project or the time frame for completion of a project, EPPs are precisely the sort of atypical, restrictive and

comprehensive prebid specifications that invoke the heightened scrutiny standard set forth in *New York State Chapter* and *Council v Bloomberg.*

In the first place, EPPs are unique. DOE has not pointed to any other municipality in the nation that has imposed a requirement that successor contractors retain the employees who were laid off when the previous contractor lost the bid at the same salary and benefit levels that the predecessor contractor provided.

With regard to the comprehensiveness of EPPs as compared to PLAs, EPPs are permanent and PLAs are job-specific. A PLA pertains to a single construction project and ends when the project is completed. By contrast, the EPPs that DOE introduced to its School-Age contracts in 1979 impact the entire industry of pupil transportation services provided under contract with DOE. They apply to all contracts for pupil transportation for all public schools throughout the City and, in practice, have remained in place continually from 1979 to 2011. Moreover, the consequences of EPPs are at least as far-reaching as those of PLAs. In the case of a new contractor, the EPPs proscribe the use of the contractor's work force altogether, as long as a single employee of the predecessor contractor is available for employment. EPPs dictate who the contractor must hire and what salary and benefits they must provide and makes these matters nonnegotiable.

Accordingly, we hold that EPPs are comparable to PLAs in their status as atypical, patently restrictive, comprehensive prebid specifications and in their potential for anticompetitive consequences. We therefore employ the more stringent review and turn to an assessment of whether, pursuant to *Council v Bloomberg*, DOE has demonstrated "proof that [EPPs] are designed to save the public money by causing contracts to be performed at smaller cost or without disruption" (6 NY3d at 392).

## III.

█ Appellants fail to refute the facially anticompetitive features of the EPPs, which tend to invite cost-inflation and discourage new bidders from attempting to compete with the long-term contract holders. As the Appellate Division noted,

> "[t]he EPP provisions at issue raise the prospect
> that a vendor will be required to assume a competing

contractor's labor costs, requiring that the vendor's bid reflect not only the known expense of compensating its own employees but also the unknown and potentially much greater expense of compensating a competitor's employees" (71 AD3d at 134).

Even if a new bidder can ascertain the pay scale of the existing contractor, the bidder does not know how many of the predecessor's employees will need to be retained or the salaries of the individual employees, which vary by seniority and other factors. In these circumstances, prudent bidders might inflate their bids to cover the contingency of having to pay unspecified salaries for a large number of a predecessor's work force, and the small-scale operations that currently hold the Pre-K/EI contracts might avoid the contest altogether for fear of losing the gamble.

A brief look at the history of New York City's public busing contracts since 1979 suggests that, in practice, the EPPs have had anticompetitive and cost-inflating effects. The existence of EPPs has resulted in the School-Age transportation contracts being performed by the same companies with roughly the same employees, year after year. By contrast, Pre-K/EI transportation, which lacks EPPs, has proceeded with competitive bidding by a variety of small-scale companies, without serious reports of corruption or labor disruption, and without threats from the unions to strike or pressure to introduce EPPs. In short, the introduction of EPPs to the Pre-K/EI bid specifications might eliminate the cost-saving, pro-competition advantages Pre-K/EI busing has enjoyed and would likely introduce the same problems of favoritism and monopolization of the market by large contractors that has beset the School-Age contracts.

DOE counters the charges that EPPs are expensive and anticompetitive with claims that the failure to introduce EPPs into Pre-K/EI contracts will cause labor strikes, which will in turn lead to disruption of contract performance. As the courts below noted, the likelihood of a strike disrupting Pre-K/EI operations is not at all clear. It would appear questionable that employees of School-Age transportation vendors would strike in order to introduce EPPs into the Pre-K/EI bids, especially since most of the current Pre-K/EI vendors are not unionized.

An additional rationale proffered for the inclusion of EPPs is to promote a skilled, safety-conscious work force comprised of veteran bus drivers. While anti-displacement provisions might

be viewed as socially beneficial, the bidding laws are not the proper avenue for achieving such goals (*see Associated Bldrs. & Contrs. v City of Rochester*, 67 NY2d 854, 856 [1986] [holding that apprenticeship training to foster a skilled work force "while a desirable end, was not intended by the State Legislature to affect the qualification of an otherwise responsible low bidder"]). Indeed, this goal could be achieved by substantially less restrictive measures, such as the imposition of an experience requirement in the bidding specifications.

Based on the foregoing, we find that DOE has not met its burden of demonstrating how EPPs reduce costs or prevent disruption of service.

## IV.

All but one of the remaining disputed bid specifications is broadly related to DOE's implementation of a modified "requirements contract" in its Pre-K/EI pricing scheme, and the last is a specification granting DOE a 2% discount for prompt payment of its bills. These specifications are not facially anticompetitive; rather they reflect the difficulty of soliciting bids to meet the vast, constantly changing demands on DOE to provide transportation to New York City school children. Accordingly, we apply the ordinary rational basis review for article 78 proceedings in assessing the validity of these specifications. Under this standard, petitioners have the burden of demonstrating that the contracting agency's determination is unlawful or improper (*see e.g. Matter of Acme Bus Corp. v Board of Educ. of Roosevelt Union Free School Dist.*, 91 NY2d 51, 55 [1997]).

DOE maintains that the "per rider per day" scheme that it seeks to implement in place of the "price per vehicle per day" scheme, which the Pre-K/EI contracts have utilized for 15 years, is equivalent to a requirements contract. This new scheme, DOE asserts, will motivate contractors to be efficient and hold down unnecessary costs. Petitioners counter that uncertainties as to where each child will have to be bused to and from and how many schools will open or close during the contract period, as well as legal restrictions that limit the amount of time a child can be on a bus for each trip, make the per rider per day scheme different from any ordinary requirements contract. With so many variables at work, petitioners insist that they will be forced to inflate bids in order to cover the most costly scenarios.

The lower courts did not strike down the per rider per day pricing scheme, but did strike the bid specifications that gave

DOE: (1) "power and sole discretion to add, delete, revise, update, reissue and/or otherwise change any or all rules, procedures, and/or requirements contained in the Contractor's Manual at any time without prior notice to the Contractor"; (2) power to delete entire schools and programs in the vendors' service requirements without an adjustment in the vendors' unit prices; (3) power to require a contractor to service any new school after the contract is entered into, at the same unit price originally bid; and (4) the advantage of not having to adjust prices except in the event of a loss of ridership in excess of 30%.

■ We now reverse the Appellate Division's order as it pertains to these bid specifications and hold that petitioners have failed to meet their burden to show that DOE's decisions regarding its implementation of the per rider per day pricing scheme are irrational. We decline to second-guess DOE's business judgment that the public interest and the aims of the bidding laws are served by a system that allocates the risks of the inevitable changes in the needs of the busing system over the length of the contract to the vendors, rather than to DOE.

■ Likewise, we reverse that part of the Appellate Division order that struck DOE's inclusion of a 2% discount for all payments made within 30 days of receipt of the vendor's invoice. The Appellate Division reasoned that the provision encouraged vendors to inflate their bids by 2% in anticipation of the deduction and, as such, contravened the goal of securing the lowest possible bids. Yet, DOE has offered the rational explanation that these discounts encourage DOE to make prompt payments, which in turn benefits vendors, who might otherwise be compelled to borrow to cover ongoing expenses. Furthermore, since the prompt payment provision applies equally to all bidders, there is no anticompetitive aspect of this specification. Again under rational basis review, we find the 2% discount to represent a legitimate exercise of DOE's business judgment, which should not be disturbed.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be modified, without costs, in accordance with this opinion and, as so modified, affirmed.

Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order, insofar as appealed from, modified, etc.