OPINION OF THE COURT
Peter H. Moulton, J.
Petitioners in this CPLR article 78 proceeding are private bus contractors that have long contracted with the City to transport New York City public school children to and from school. They challenge a request for bids issued by respondent Department of Education (DOE) in December 2012 (the December RFB), and the subsequent award of school bus contracts pursuant to the December RFB.
Petitioners assert that their existing contracts for other school bus routes — routes not covered by the December RFB — obligate them to submit bids for the December RFB containing various labor provisions that favor unionized school bus drivers, dispatchers, mechanics, and chaperones. Petitioners assert that the necessary inclusion of these provisions, called “Employee Protection Provisions” (EPPs), embeds a cost in petitioners’ bids that places them at a competitive disadvantage with respect to other bidders who are not bound by these EPPs.
EPPs have long been required by the DOE — and its predecessor the Board of Education — in bidding out school bus contracts. However, the continued viability of EPPs was cast in doubt by the Court of Appeals’ recent decision in Matter of L&M Bus Corp. v New York City Dept. of Educ. (17 NY3d 149 [2011]). Petitioners argue that the EPPs are unlawful under the L&M decision.
*838 In their reply papers petitioners articulate a second argument: that the December RFB was fatally ambiguous because it did not make it sufficiently clear that EPP provisions in existing contracts are not to be included in any bid for the routes covered by the RFB.
As their requested relief, petitioners first sought a declaration that the EPPs in their existing contracts are unlawful. In the petition, they sought the removal of the EPPs from their existing contracts, contracts which will last until 2015. At oral argument and in their latter papers, petitioners changed their request for relief: they now seek a declaration “modifying” or “amending” the EPPs in petitioners’ existing contracts to make it clear that the EPPs do not apply to any bid they make on a new RFB. They also seek preliminary and permanent injunctive relief preventing DOE from proceeding with any contracts awarded pursuant to the December 2012 RFB.
In response, the DOE asserts that it omitted any requirement for EPPs in the December RFB because of the Court of Appeals’ decision in L&M. However DOE contends that the L&M Court did not find that EPPs were per se illegal. Rather, respondents argue that the L&M Court held that the EPPs at issue in that case ran afoul of New York State’s bidding laws because they could not pass a heightened scrutiny test that would show that the EPPs were designed to protect the public fisc, “encourage robust competition,” or prevent favoritism (at 153).
For the December RFB, the DOE made a determination that an EPP provision would not pass heightened scrutiny. However, the DOE does not take the position that L&M voids EPP provisions in existing contracts. DOE notes that the Court in L&M was looking at an RFB for new bus routes, not in existing contracts, and so that case provides no authority for disturbing the existing contracts.
Intervenor Local 1181-1061, Amalgamated Transit Union, AFL-CIO asserts that it is the largest union representing the drivers, mechanics and matrons/escorts employed by petitioners and other school bus companies that contract with DOE. Local 1181 claims that it is a third-party beneficiary of the petitioners’ contracts with DOE. It opposes petitioners’ attempt to excise EPPs from existing contracts.
Background
DOE’s authority to provide bus transportation to New York City public school students is set forth in various state and *839 federal statutes. There are two general categories of school bus service: (1) “special busing,” for children with disabilities and (2) “general busing” for students who do not have disabilities and for students with disabilities who do not require special modes of transportation.
The inclusion of EPPs in their present form in school bus contracts began in the wake of a 1979 strike by Local 1181. The strike was precipitated by DOE’s removal of two provisions that had favored workers from a bid solicitation that year. First, prior to 1979 the DOE’s school bus contracts contained some version of the following provision: “employees of private bus companies who lose their jobs as a result of the loss of the contract by a previous contractor must be given priority in hiring according to seniority by any replacement contractor.”
The second labor-friendly provision that was omitted from the 1979 bid solicitation was a requirement that bus companies pay their employees’ wages and benefits at a rate tied to the rates afforded New York City Transit Authority workers.
The strike lasted three months. It was concluded by a stipulation of settlement negotiated in part by Milton Mollen, then the Presiding Justice of the Second Department. The “Mollen Agreement” as it came to be known, essentially restored the first of the two provisions that DOE had sought to exclude from the RFB. The EPPs that became standard in the industry as a result of the Mollen Agreement establish two “industry-wide master seniority lists,” one list for drivers, mechanics and dispatchers, and the second list for chaperones/escorts. If any employee becomes unemployed because her employer loses its contract with DOE, then the employee’s name gets listed on the appropriate master list ranked by her seniority. Bus companies seeking to hire must hire their employees from these seniority lists.
With a few exceptions, since 1979 the DOE has negotiated extensions of school bus contracts, rather than putting them up for bid. The bus companies performing pursuant to the extensions would change from time to time, but remained fairly stable. EPPs were included in all extensions of contracts.
This regime was altered when responsibility for school bus contracts for prekindergarten (Pre-K) and early intervention (El) students was transferred from the Department of Transportation (DOT) to DOE. The DOT contracts had not included EPPs. When it came time to rebid these Pre-K and El contracts, DOE included the EPP requirement in its requests for bids.
*840 The EPPs in the Pre-K and El RFBs were challenged by certain school bus companies, which alleged that the provisions were anti-competitive and therefore in violation of the state’s public contracting laws. The trial court agreed with petitioners, and its ruling was upheld in the First Department and in the Court of Appeals.
The Court of Appeals found that bidders on the RFB would inflate their labor costs in submitting bids because they did not know the wage rates of persons they would be forced to hire from the master lists. The Court noted that General Municipal Law § 103 mandates that “all contracts for public work ... be awarded to the lowest responsible bidder” (at 156). The Court analogized EPPs to public labor agreements (PLAs). PLAs are pre-bid labor agreements between unions and a contractor seeking to bid on a public project that mandate certain labor protections. The Court has found that PLAs have an anti-competitive effect, and that they therefore must pass a heightened scrutiny test that demonstrates the PLAs serve some other important public purpose.
The Court noted that PLAs are job-specific, and that EPPs, by contrast, had become a permanent fixture in bidding for school bus contracts. The Court continued:
“Moreover, the consequences of EPPs are at least as far-reaching as those of PLAs. In the case of a new contractor, the EPPs proscribe the use of the contractor’s work force altogether, as long as a single employee of the predecessor contractor is available for employment. EPPs dictate who the contractor must hire and what salary and benefits they must provide and makes these matters nonnegotiable.” (17 NY3d at 158.)
The Court looked at DOE’s justifications for the EPPs and found that they did not satisfy the strict scrutiny test. The Court found that it was “questionable” that EPPs were necessary to avert labor unrest as the Pre-K and El contractors were not unionized and, under the DOT regime, the work force had not benefitted from EPPs. The Court also found that there were other, less costly, means to ensure an experienced work force.
DOE determined not to include EPPs in the December RFB which was issued on December 21, 2012. In response, Local 1181 and other unions went on strike in January 2013, and returned to work on February 20, 2013. Local 1181 and a number of school bus companies have an ongoing proceeding before the National Labor Relations Board.
*841 The December RFB concerns bus routes currently provided under DOE special bussing contracts which were extended in 2010 and expired in June 2013. Petitioners were not parties to any of these now-expired contracts. Petitioners have other existing school bus contracts that are set to expire in June 2015.
DOE recites that the December RFB served its intended purpose of boosting competition. Numerous new companies without existing DOE contracts submitted bids, as well as incumbent companies. According to DOE, it received bids from 65 vendors on 34 “service classes”[1] with vendors bidding on multiple service classes, an average of 16 bids per class. The bidders include 25 incumbent vendors, 12 of whom have contracts that expire this year, and 13 with continuing contracts on other routes, routes not covered by the December RFB.
Petitioners did not bid on any of the service routes covered by the December RFB. They claim that they were hobbled by the EPPs contained in their existing contracts, and that these EPPs would have required them to include higher labor costs in a bid for routes covered by the December 2013 RFB. Petitioners argue that these higher labor costs caused by the EPPs had this negative effect on the bids of incumbent vendors who did bid on the December RFB. Petitioners assert that incumbent vendors were unable to submit competitive bids. It appears that only one vendor with another continuing contract with DOE was awarded any of the service classes included in the December RFB.
The two sides disagree as to whether the December RFB enhanced competition. DOE claims that the increased number of new vendors, and the competitive bidding that resulted, will lower its school bussing costs by as much as $100 million over five years. Petitioners claim that incumbent bidders were either dissuaded from bidding, or submitted noncompetitive bids inflated by higher labor costs, because of the EPPs in their existing contracts. According to the petitioners, competition was actually retarded by the fact that existing companies are yoked to EPPs.
Discussion
A. Timeliness of the Petition
In its initial papers in opposition to the petition, DOE *842 argues that the petition is barred by the four-month statute of limitations (CPLR 217) and by loches. This argument fails. Petitioners’ claims sound in the nature of “mandamus to review” the RFB and the petition was filed less than four months after DOE issued the December RFB. As refined during the pendency of this proceeding, petitioners’ claims of harm arise from (1) their purported inability to submit a bid pursuant to the December RFB because they were bound by the language requiring EPPs in their existing contracts, and/or (2) because the December RFB was ambiguous in not making clear that the EPPs in existing contracts did not apply to the December RFB. Under either theory, the date of the RFB’s issuance is the date of the harm. Accordingly, petitioners timely brought this proceeding. (See Matter of Acme Am. Refrig., Inc. v New York City Dept. of Educ., 34 Misc 3d 392 [2011].)
B. Merits of the Petition
Petitioners’ first theory, that the EPP provisions in their existing contracts require that they include EPPs in any contracts they enter into with the DOE thereafter, at least during the life of the existing contracts, is without merit.
The EPP provisions of the existing contracts relied on by petitioners in advancing this argument state in relevant part as follows:
“There shall be established two industry-wide Master Seniority Lists. One list shall be composed of all operators (drivers) mechanics, and dispatchers and the other list shall be composed of escorts (matrons-attendants) who were employed as of June 30, 2010, under a contract between their employers and the [DOE] for the transportation of school children in the City of New York, who are furloughed or become unemployed as a result of loss of contract or any part thereof by their employers, or as the result of a reduction in service directed by the Board during the term of the contract, in accordance with their date of entry into the industry ....
“Any existing contractor . . . shall give priority in employment in September 2010 or thereafter on the basis of position on the Master Seniority list of any additional or replacement operators, mechanics and dispatchers . . . .”
Petitioners interpret these portions of the EPPs in their existing contracts as binding them, during the life of the existing *843 contracts, to hire off the master list for any bus contract with the DOE, not just the existing contract. Their existing contracts do not expire until June 30, 2015. Accordingly, petitioners contend that they were bound to the EPPs in bidding on the December RFB, which meant that their bids would be too high in comparison to the bids of vendors who are not bound to EPPs. This argument hinges on the meaning of the words “or thereafter” in the second paragraph quoted above.
The words “or thereafter” do not carry the heavy freight assigned to them by petitioners. The phrase says nothing about future contracts with the DOE. Any attempt to make the EPPs apply to future contracts would run athwart the public policy that governmental entities must be free to enter into contracts that address the changing needs of the public, the availability of public funds, and a host of other factors. As the Court of Appeals stated in Varsity Tr. v Saporita (48 NY2d 767, 768 [1979]):
“[T]he inclusion of certain requirements in bid specifications contained in prior public contracts does not comprise an implied representation that similar requirements will be mandated with respect to subsequent contracts. The possibility that the needs and requirements of a municipality will change so as to render useless investments made in the hope that those requirements would remain constant is a normal risk of doing business which may not be shifted to the municipality by application of an estoppel theory . . . .”
While the court holds that the EPPs in petitioners’ existing contracts did not bind petitioners in bidding on the December RFB, or in bidding on any future RFB that does not require EPPs, it declines to award petitioners the broad declaratory relief that they seek: the amendment[2] of the existing contracts’ EPPs. Such a declaration is unnecessary because the contracts are clear and do not require modification.
*844 At certain points in their papers, petitioners seem to seek an even broader declaration: that EPPs shall not be allowed in any future RFB. This argument is based on the Court of Appeals’ decision in L&M. This relief is denied. The L&M Court did not find that EPPs were per se illegal. Rather, the L&M Court held that the EPPs must pass a heightened scrutiny test that would show that the EPPs were designed to protect the public fisc, “encourage robust competition,” or prevent favoritism (17 NY3d at 153). The implication of course is that an EPP that could pass heightened scrutiny would be permissible under the state’s bidding laws.
Petitioners’ second argument, that the December RFB was fatally ambiguous because it did not make clear that the EPPs were not required in bids, also fails. This theory is not contained in the petition, it was raised for the first time in petitioners’ reply, and so cannot be considered by the court. (E.g. Matter of Stoves & Stone, Ltd. v Martinez, 17 AD3d 683 [2005].)
Even were the court to consider this argument, it is without merit. There is nothing in the December RFB that requires bids to include EPPs. There is nothing in the December RFB that states that existing contracts’ EPPs must apply to new contracts that do not contain such provisions. Finally, the December RFB contained a merger clause that made it clear that the written contract constitutes the “whole agreement of the parties,” and it incorporates no other contract by reference.
Conclusion
For the reasons stated petitioners have failed to carry their burden to demonstrate that respondent’s actions were arbitrary, capricious or contrary to law. (CPLR 7803.) The petition is denied and the proceeding is dismissed. The motion for a preliminary injunction is denied.

. As the court understood DOE’s explanation at oral argument, the term “service classes” refers to routes and also to the modality of transportation. Different bus types are determined by the needs and number of students on a given route.

. As noted above, petitioners stated at oral argument that they were no longer seeking the removal of the EPPs from their existing contracts. However, that prayer for relief remains, perhaps vestigially, in the conclusion of their reply memorandum of law. To the extent that the petitioners seek excision of the existing EPPs from their existing contracts, that relief is denied. L&M does not support petitioners’ argument. The Court in L&M was looking at an RFB for new bus routes, not in existing contracts, and so that case provides no authority for disturbing the existing contracts. Bids on the existing contracts incorporated the higher labor costs caused by EPPs. To remove that cost, but to retain the amount paid by DOE, would provide petitioners with a windfall.