NATIONAL LABOR RELATIONS BOARD, Petitioner–Cross Respondent,

v.

WPIX, INC., Respondent–Cross Petitioner,

Newspaper Guild of New York, Local 3, AFL–CIO, Intervenor.

Nos. 927, 928, Dockets 89–4136, 89–4142.

United States Court of Appeals, Second Circuit.

Argued March 2, 1990.

Decided June 25, 1990.

Joseph H. Bornong, Atty., N.L.R.B. (Howard E. Perlstein, Supervisory Atty., Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner-cross respondent.

Richard L. Marcus (Susan M. Benton–Powers, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., of counsel), for respondent-cross petitioner.

Irwin Bluestein, Stuart E. Bauchner, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, of counsel, submitted a brief, for intervenor.

Before OAKES, Chief Judge, and KEARSE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

On February 28, 1989, the National Labor Relations Board ("the Board") found that WPIX, Inc. ("the Company") had violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5) ("the Act"), by unilaterally implementing changes in terms and conditions of employment without first bargaining to an impasse with intervenor Newspaper Guild of New York, Local 3, AFL–CIO ("the Union"), and by refusing to pay contractually required wage-step increases. Because we find that substantial evidence on the record as a whole supports the Board's findings, we enforce its order.

## BACKGROUND

The underlying facts are largely undisputed. They are based on careful findings by the Administrative Law Judge who explicitly evaluated the credibility of the witnesses.

WPIX operates a television broadcasting station in New York City. Since 1972, the Union has represented certain employees who write and edit news programs produced by the station. The most recent collective bargaining agreement between the parties ran until June 24, 1986 ("the Agreement"). It provided that its terms would remain in effect until negotiations for a successor agreement were lawfully terminated. Article XVII of the Agreement required the Company to grant employees periodic step increases in pay after specified periods of service. On April 24, 1986, the Union informed WPIX that it wished to negotiate changes in the Agreement. Significantly, the Union requested, among other things, a "substantial"—although unspecified—wage increase. Over the course of the next nine months, the parties held twelve meetings, which need only be summarized here.

The parties' first meeting occurred on July 1, 1986, and addressed, among other issues, the Company's decision to lay off certain Union members shortly before the

negotiations began. The Company said it was "not thrilled about" the Union's written proposal, but the Company had no written proposal of its own. At subsequent meetings on July 22, again on August 8 and again on August 13, the parties addressed such matters as the step increases and the employees' dental plan, and the Union explained that it considered the step increase an "integral part" of the Agreement. Despite the Union's request for a wage increase, by the fourth meeting the Company still had not offered even a preliminary wage proposal. According to the Company's representative, the subject of wages was "always sort of deferred in [the] first three meetings." Although he thus recognized that a significant outstanding issue had not even been addressed, the Company's representative nonetheless volunteered at the August 13 meeting that it appeared that the parties were bargaining towards impasse—a conclusion the Union quickly rejected.

At the next meeting on October 1, the Company presented its proposal, which envisioned twenty modifications to the Agreement and a slight increase in wages. Also at that meeting, the Union broached the Company's failure to pay the contractually required step increases. The Company admitted that those step increases had not been made.

On October 27, the Union filed for arbitration on the issue of the Company's failure to pay the step increases. On November 7, the Company rejected the arbitration demand. The parties next met on December 12, and again agreed to defer discussion of economic items to a later date. At a meeting held on December 16, the parties agreed to seek the aid of a mediator. Two more meetings were held in January of 1987, during which the parties addressed the possible change in health insurance carriers and bereavement leave. On January 30, by prearranged agreement, the parties met separately with a mediator. The Company informed the mediator that another "new" proposal was in the offing.

At a meeting held on February 6, the Company announced "a new proposal," and a significant number of items were indeed raised for the first time. On February 24, the Union agreed to a Company proposal to switch insurance carriers. On February 26, the parties addressed a wide variety of outstanding issues, including a possible withdrawal of a request for arbitration, dental plan questions, the presence of loose asbestos on Company premises and the proper composition of the bargaining unit. The next meeting was scheduled for April 1. Before that meeting, the Company informed the Union that it had dropped seven of the new proposals it had first presented at the February 6 meeting. On April 1, the Union dropped fourteen demands and modified three others, and the parties addressed a variety of issues, resolving a few. At the end of the April 1 session, the Company appeared ready to meet the next day. The Union's lead representative said he would not be available until April 21 but expressed the Union's desire to continue the negotiations. The Company, however, announced that "given what has gone on here [we] believe we're at an impasse....".

On April 2—four days before the scheduled arbitration hearing—the Company informed the Union that it would institute retroactive step increases for the employees named in the Union's demand for arbitration. The Union responded that, in addition to those employees, it sought relief for employees not named in its original demand for arbitration but who were nonetheless affected by the Company's action. The matter proceeded to arbitration, which the Company refused to attend. The arbitrator ruled in favor of the Union and ordered the Company to make all employees whole to the extent the Company had not already done so.

The Company's alleged violations of the Act were tried before an Administrative Law Judge over four days in the fall of 1987. On May 12, 1988, she found that the Company had prematurely declared an impasse and improperly ceased paying contractually required step increases. Nine months later, the NLRB affirmed the ALJ's ruling, which it expanded to address the Company's failure to pay the required wage-step increases since October 9, 1986.

The NLRB, joined by the Union as intervenor, now petitions this court for enforcement of its order, and the Company cross-petitions to vacate the Board's order.

## DISCUSSION

■ An employer bargains in bad faith, and thus violates sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5), if it unilaterally alters terms and conditions of employment before first reaching a true impasse in negotiations. *See, e.g., NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). Such unilateral action "detracts from the legitimacy of the collective bargaining process by impairing the union's ability to function effectively, and by giving the impression to members that a union is powerless." *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 64–65 (2d Cir.1979). A genuine impasse in negotiations exists when there is " 'no realistic prospect that continuation of discussion ... would [be] fruitful.' " *NLRB v. Independent Association of Steel Fabricators*, 582 F.2d 135, 147 (2d Cir.1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979) (citation omitted). A "fundamental tenet of the [A]ct [is] that even parties who seem to be in implacable conflict may, by meeting and discussion, forge first small links and then strong bonds of agreement." *AFTRA v. NLRB*, 395 F.2d 622, 628 (D.C. Cir.1968).

■ "[T]he issue of the existence of an impasse 'is a question of fact peculiarly suited to the Board's expertise.' " *Carpenter Sprinkler Corp.*, 605 F.2d at 65 (quoting *NLRB v. J.H. Bonck Co.*, 424 F.2d 634, 638 (5th Cir.1970). And the Board's finding of no impasse can be overturned only if it was not supported by "substantial evidence." 29 U.S.C. §§ 160(e) and (f). While this deferential standard does not permit an abdication of judicial review, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), our review of the record as a whole persuades us that substantial evidence supports the Board's conclusion that no impasse existed.

We cannot fault the determinations of the ALJ and the Board that the Company prematurely declared an impasse. Although the negotiations first began in July of 1986, the Company waited five months after the Union requested negotiations before presenting its first comprehensive written contract proposal on October 1. Four months later, on February 6, the Company increased its proposed changes in the Union's requested contract from twenty to forty. Relying on those proposals, the ALJ concluded that bargaining "began anew" on those dates. We agree, and note for instance that the Company's representative repeatedly described the February 6 proposal as "new," rather than as essentially the same proposal with some revisions and modifications. However, even accepting WPIX's position that there was no "new" bargaining but only a continuation of ordinary "give and take," the fact remains that the negotiations were not static. When the Company declared an impasse on April 1, 1987, changes were being made, revisions were being offered and, as the ALJ reasonably concluded, the Union needed more time to evaluate and respond to the Company's position.

Further, as of April 1, progress was discernable. The Company admits, for instance, that on January 30 it told the mediator that it would revise a few of its proposals, and that, in a letter dated March 20, 1987, it "sent substantial modifications of the Company's February 6 proposals" to the Union, dropping no fewer than seven of its demands and modifying others. Yet at the very first meeting after making those "substantial modifications," the Company declared an impasse.

In the main, WPIX argues that, progress in other areas notwithstanding, "it is undisputed that, on April 1, the parties were further apart on each and every critical economic and flexibility issue than they were when they commenced bargaining." What WPIX ignores, however, is that significant economic issues, such as wages, were deliberately deferred at meeting after meeting. If—as the Company claims—all parties knew those key economic issues

could not be resolved, one might well wonder why the parties would have bothered to discuss in the meantime what the company now dismisses as insignificant issues. The Company itself explains that the Union "for the first time [at the April 1 meeting] ... quantified its initial proposal for a 'substantial' wage increase." Without the premature declaration of the impasse, we cannot conclude on the record before us that progress on this proposal would have been unlikely—even if, as the Company repeatedly emphasizes, the parties' wage positions were far apart. An opening negotiating position often bears little resemblance to the conditions ultimately accepted after rounds of serious bargaining, and while the Company places great weight on the distance between the positions, no serious attempt was ever made to lessen that distance. *See Carpenter Sprinkler Corp.,* 605 F.2d at 65 (recognition by both sides that their respective positions are generally far apart is insufficient, on its own, to support declaration of impasse). We agree with the Company that there is no requirement that it devote a full meeting to the discussion of core economic issues, but where the Company relies on that very deficiency in the negotiations to justify its declaration of an impasse, it must point to at least some evidence of negotiations on that subject in the record. In addition, many mandatory subjects of bargaining, presented in the February 6 company proposal, were similarly never discussed.

The Company also urges in support of its claim of impasse that the Union dismissed certain company proposals as being "ridiculous" or a "slap in the face" to the bargaining unit. The Company, for instance, complains that Union newsletters stated that the Union would never accept certain Company proposals. What a party tells its partisans during negotiations, perhaps to rally support, may well have little bearing on the terms of employment that party ultimately accepts. Beyond that, there is no evidence in the record that WPIX was aware of the Union newsletters during the negotiations and before it declared an impasse. A review of the record leaves little doubt that both sides engaged in some exaggeration, posturing and dilatory tactics, as might be expected in labor negotiations, and none of which is dispositive on this appeal.

In light of the foregoing, and upon review of the entire record, we conclude that the NLRB's finding of no impasse was supported by substantial evidence.

■ Finally, the Board's finding that WPIX violated the Act by failing to pay contractually required step increases is similarly supported by substantial evidence on the record considered as a whole. A unilateral change in an established working condition, such as a unilateral decision to stop paying contractually required step increases, violates the Act. *See, e.g., Katz,* 369 U.S. 742–43, 82 S.Ct. at 1111. It remains undisputed that the Company stopped paying the step increases as of September 1986. The Company instead contends that it acted in good faith, that it lacked the economic resources to make the increases, that it made the affected employees whole before the charges in this case were filed, and that its action at most constitutes a "technical" violation of the Act. *See United States Postal Service,* 253 NLRB 1203, 1206 (1981) (Penello, concurring) (violation "technical" and needs no ordered remedy where "quantum of misconduct is so slight, or its effect so substantially remedied by the wrongdoer's subsequent action"); *Bellinger Shipyards, Inc.,* 227 NLRB 620 (1976) (" 'Respondent voluntarily put itself in compliance with the Act. It is considered that such [voluntary] action should be encouraged.' ") (citation omitted).

We are not persuaded by the Company's arguments. This was not a technical violation on a peripheral issue. Rather, the step increases affected a principal item under negotiation—the employees' wages—and remained, as the Union informed the Company as early as August of 1986, an "integral part" of the Agreement. By failing to comply with the Agreement on this score, the Company in effect held hostage the step increases to the completion of negotiations favorable to the Company. As the Company's representative explained, after

the Company had suspended the step increases, *"[E]verything has a price tag* and it might be appropriate to defer those raises so that the [C]ompany would have funds to pay a raise to the rest of the members of the unit." (Emphasis added). In such circumstances the Company cannot belatedly supply "good faith" by making retroactive payments only after it prematurely declared an impasse, and even then only on the eve of an arbitration in which it refused to participate, the outcome of which appeared clear. *Cf. Truck Drivers et al. v. NLRB*, 509 F.2d 425, 427 (D.C.Cir.1974) (timing of violator's remedial action has bearing on Board's decision). Indeed, good faith alone would not excuse a violation of the Act. *See Katz*, 369 U.S. at 742–43, 82 S.Ct. at 1111.

The Company has also fallen far short of establishing an economic necessity for its unilateral action—not dispositive in any event—while at the same time diminishing the effect of its action. "[R]etroactive compensation eliminated any potential 'adverse economic effect' which the denial of increases may have occasioned," the Company contends. But by framing the issue so narrowly, the Company ignores the fact that such unilateral action on so important an issue not only undoubtedly affects employee perceptions of the efficacy of the collective bargaining process, but also has a real economic effect few employees would deem "slight." We are presented here with a deliberate violation of the Act that affected a central aspect of the collective bargaining process and denied certain employees part of the wages they were due.

## CONCLUSION

For the reasons set forth above, we find substantial evidence on the record as a whole supports the Board's decision and thus grant the Board's petition for enforcement of its order and deny WPIX's cross-petition to set aside the order.