James G. PAULSEN, Regional Director of Region 29 of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of The National Labor Relations Board, Petitioner,

v.

ALL AMERICAN SCHOOL BUS CORP., ANJ Service, Inc., Atlantic Queens Bus Corp., Bobby's Bus Co. Inc., Boro Transit, Inc., B–Alert Inc., Atlantic Escorts Inc., City Wide Transit, Inc., Canal Escorts, Inc., Cifra Escorts, Inc., Empire State Escorts, Inc., Gotham Bus Co. Inc., Grandpa's Bus Co., Inc., Hoyt Transportation Corp., IC Escorts Inc., Kings Matron Corp., Logan Transportation Systems, Inc., Lonero Transit Inc., Lorissa Bus Service Inc., Mountainside Transportation Co., Inc., Pioneer School Bus Rental, Inc., Pioneer Transportation Corp., Rainbow Transit Inc., Amboy Bus Co., Inc., Reliant Transportation, Inc., RPM Systems Inc., School Days Inc. and Tufaro Transit Co. Inc., Respondents.

No. 13–CV–3762 (KAM).

United States District Court, E.D. New York.

Aug. 28, 2013.

Annie Hsu, Erin E. Schaefer, Nancy B. Lipin, National Labor Relations Board, Brooklyn, NY, Nancy K. Platt, Paul Augustus Thomas, National Labor Relations Board, Washington, DC, for Petitioner.

Richard Milman, Michael James Mauro, Milman Labuda Law Group PLLC, New Hyde Park, NY, Jessica Lee Boffa, Kevin Michael Brown, Timothy Harris Wolf, Jeffery D. Pollack, Mintz & Gold LLP, New York, NY, for Respondents.

### *MEMORANDUM & ORDER*

MATSUMOTO, District Judge.

Petitioner James G. Paulsen, Regional Director of Region 29 of the National Labor Relations Board ("NLRB"), acting for and on behalf of the NLRB, has filed a motion seeking a preliminary injunction under section 10(j), 29 U.S.C. § 160(j), of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 151–169. Respondents are companies that contract with the New York City Department of Education

("DOE") to provide school bus transportation services. Petitioner seeks a preliminary injunction (i) ordering respondents to bargain in good faith, and (ii) ordering rescission of the unilateral changes imposed by respondents when they implemented their 'best and final Offer on March 22, 2013.

After reviewing the briefing by the parties and amicus curiae Local 1181–1061, Amalgamated Transit Union, AFL–CIO ("Local 1181"), the transcript ("Tr.") and exhibits presented at the NLRB hearing before Administrative Law Judge Raymond P. Green ("ALJ hearing"), and hearing oral argument, the court grants petitioner's request for a preliminary injunction for the reasons provided below.

## BACKGROUND

### A. Procedural Background

On July 3, 2013, petitioner filed the instant action seeking a preliminary injunction under section 10(j) of the Act against respondents. (ECF No. 1, Motion for Preliminary Injunction, 7/3/13.) An order to show cause hearing regarding the motion was initially scheduled for July 16, 2013. (ECF No. 2, 7/13/13.) Respondents moved to postpone the preliminary injunction hearing until after the conclusion of the ALJ hearing concerning the same issues that was scheduled to commence on July 22, 2013. (ECF No. 6, *Letter Motion to Adjourn Conference,* 7/8/13.) On July 9, 2013, the court held a telephonic hearing concerning the motion and ruled, over petitioner's objection, that it was appropriate to postpone the hearing until the conclusion of the ALJ hearing. (*Id.*) The court also subsequently granted Local 1181's motion to appear as amicus curiae. (Order Granting Motion for Leave to Appear as Amicus Curiae, dated 7/12/13.)

On July 12, 2013, respondents filed an answer to the petition, a counterclaim against petitioner, and a third party complaint against NLRB members Sharon Block, Richard Griffin, and NLRB acting general counsel Lafe Solomon. (ECF No. 18, *Answer, Counterclaim, and Third Party Complaint,* 7/12/13.) Respondents, despite their earlier application to postpone the preliminary injunction hearing pending the ALJ hearing, also moved for a temporary restraining order and preliminary injunction to enjoin the ALJ hearing, arguing that the NLRB was acting unconstitutionally without a lawfully appointed quorum. (ECF No. 25, Motion for Temporary Restraining Order, Motion for Preliminary Injunction, 7/17/13). The NLRB opposed respondents' application for a temporary restraining order and preliminary injunction on July 18, 2013, (ECF No. 26, Memorandum in Opposition to Motion for Temporary Restraining Order, Motion for Preliminary Injunction, 7/17/13), and the court denied respondents' motion for a temporary restraining order and preliminary injunction, (Order dated 7/18/13; Order Denying Motion for Temporary Restraining Order and Preliminary Injunction dated 7/19/13). The ALJ hearing took place from July 22 to 26, and July 29 to July 31, 2013. Briefing on the preliminary injunction motion was completed on August 12, 2013, (ECF Nos. 47–55), and the court heard oral argument on the preliminary injunction motion on August 20, 2013, (Minute Entry dated 8/20/13). Following oral argument, respondents submitted a notice of supplemental authority concerning the petitioner's legal authority to file a 10(j) petition, (ECF No. 59, Respondents' Notice of Supplemental Authority, 8/21/13), and petitioner submitted a response on August 23, 2013, (ECF No. 62, Reply in Opposition, 8/20/13).

## B. Factual Background

The respondents in this case are 28 companies that contract with the New York City Department of Education ("DOE") to provide school bus transportation for general and special education students. (Tr. at 79–80.) Respondents employ 8,800 school bus drivers and escorts (employees who assist special education students), who are represented by Local 1181. (*Id.* at 83, 272–273.) These employees comprise 70–75% of all school bus drivers and escorts who transport children for the DOE. (*Id.* at 273.) Nearly all respondent companies and Local 1181 have bargained in contract negotiations for over thirty years. (*Id.* at 80–81.) During that time period, Local 1181 has signed identical collective bargaining agreements ("CBAs") with each respondent. (*Id.* at 79–80.) Respondents have historically bargained together and submitted one proposal to Local 1181. (*Id.* at 80, 83.)

### 1. The 2009–2012 CBA

The previous CBA ran from July 1, 2009 to December 31, 2012 ("2009–2012 CBA"). (General Counsel's Exhibit ("GC Ex.") 2.) For the first time in the parties' bargaining history, that CBA included a Most Favored Nations ("MFN") clause. (*Id.* at Section 51.) Under the MFN clause, if Local 1181 granted any employer certain specified economic terms more favorable than the equivalent terms in the CBAs with respondents, then any respondent could adopt those more favorable terms in its CBA with Local 1181. (*Id.*) The MFN clause contained a sunset provision, under which the MFN clause ended with the expiration of the 2009–2012 CBA. (*Id.*) Respondents had insisted on an MFN clause in the 2009–2012 CBA because New York City had indicated it wanted to solicit bids for school bus transportation contracts. (Tr. at 1315–1317.) During the negotiations of the 2009–2012 CBA, respondents repeatedly asked for the MFN clause, and Local 1181 repeatedly refused the request. (*Id.* at 89–90.) Local 1181 eventually agreed to the MFN clause on the last day of negotiations after securing other items from respondents, (*id.*), however, there is no evidence that the MFN clause was ever invoked by the respondents. Jeffrey Pollack ("Pollack"), an attorney for respondents, was their main spokesperson at the 2009 bargaining sessions, and Michael Cordiello ("Cordiello"), the president of Local 1181, was the spokesperson for the union. (*Id.* at 89.)

### 2. Employee Protection Provision

Respondents also signed separate contracts with the city in connection with DOE school bus route contracts. Since 1979, when Local 1181 participated in a lengthy strike, the city has required every contract with every school bus company providing K–12 transportation services to contain what is known as the Employee Protection Provision ("EPP"), (*id.* at 83–84, 111, 295), which is in turn referenced in the contracts the bus companies have with Local 1181, (*id.* at 1077). Under the EPP, any Local 1181 member who loses his or her job is placed on a master seniority list, and companies with DOE contracts are required to hire those employees off the master seniority list in order of seniority. (*Id.* at 83–87, 300–308.) At least once a year, during an event called the "Master Pick," displaced employees select new employers based on seniority. (*Id.* at 300–308.) A Local 1181 employee maintains his or her seniority, and attendant wages and benefits, when joining a new employer. (*Id.* at 83–84, 300–301.)

In 2011, the New York Court of Appeals ruled that EPPs violated New York laws that require contracts for public work to be awarded to the lowest responsible bidder. *In re L & M Bus Corp. v. New York City Dep't of Educ.*, 17 N.Y.3d 149, 927

N.Y.S.2d 311, 950 N.E.2d 915, 922 (2011). In its decision, the Court of Appeals subjected EPPs to heightened scrutiny because they were "atypical, patently restrictive, comprehensive prebid specifications ... [with] potential for anticompetitive consequences." *Id.*, 927 N.Y.S.2d 311, 950 N.E.2d at 921. The court explained that "in practice, the EPPs have had anticompetitive and cost-inflating effects .... [and] resulted in ... transportation contracts being performed by the same companies with roughly the same employees, year after year," *id.*, 927 N.Y.S.2d 311, 950 N.E.2d at 921, and noted that the DOE had failed to show "how EPPs reduce costs or prevent disruption in service," *id.*, 927 N.Y.S.2d 311, 950 N.E.2d at 922.

In December 2012, Mayor Michael Bloomberg announced that New York City would begin bidding out transportation contracts for certain routes that were expiring in 2013, and that the new contracts would *not* contain EPPs. (Tr. at 87–88, 109–110.) This development significantly weakened the ability of respondents to win bids on new contracts because respondents had to account for EPP costs, while the new companies that did not have to account for EPP costs could offer significantly lower bids than respondents. In the first round of new bids, several respondent companies lost work, and only one respondent won work. (*Id.* at 236–240, 1016–1018, 1325–1327.) One respondent, Hoyt Transportation, has filed for bankruptcy. (ECF No. 28, Suggestion of Bankruptcy, 7/19/13.)

The announcement also weakened seniority protection for members of Local 1181. Local 1181 engaged in a city-wide strike from January 16 to February 15, 2013. (Tr. at 117–118, 128, 218.) Mayor Bloomberg did not change his position, and union employees returned to work despite failing to win back EPPs. (*Id.* at 637–638.)

### 3. The 2012–2013 Negotiations

The current negotiations began with a meeting on October 23, 2012. Again, Pollack was the main spokesperson for respondents at the bargaining sessions, and Cordiello was the spokesperson for the union. (*Id.* at 80, 89.) Richard Gilberg ("Gilberg"), an attorney for Local 1181, was present at all of the bargaining sessions except for the one on January 8, 2013. (*Id.* at 503–04.)

The parties met for seven bargaining sessions from October 23, 2012 through February 12, 2013. (*Id.* at 96–129.) The parties made little progress at these sessions, however, because of concerns over the DOE's decision to eliminate EPPs in bids and Local 1181's decision to strike. (*Id.*) The MFN clause was not discussed at length during these sessions. (*Id.* at 102, 108, 117, 119, 125, 128.) Respondents requested concessions and stated they were losing money, and Local 1181 sought permission to review respondents' audited financial records. (*Id.* at 103, 107.) At the November 20, 2012 bargaining session, Cordiello suggested extending the CBA for a year with the MFN clause, but respondents rejected the proposal. (*Id.* at 103–04.)

Respondents requested and Local 1181 rejected the MFN clause at the eighth session on February 26, 2013. (*Id.* at 132.) Several respondents agreed, however, to let Local 1181 review documents describing their financial conditions if the union agreed to confidentiality stipulations. (*Id.* at 136.)

At the ninth session, on March 5, 2013, the parties discussed, and made progress on, issues such as overtime, wages, sick days, pay for charter runs, facility maintenance, back pay, holiday and school closing pay, and arbitration. (*Id.* at 140–143.)

The MFN clause did not receive any substantial discussion. (*Id.* at 148.)

At the tenth bargaining session, on March 11, 2013, there was movement on wage increases for new hires, bonuses, employee discipline, and outstanding backpay. (*Id.* at 151–155.) Local 1181 proposed that the CBA not include a MFN clause, which respondents rejected. (*Id.* at 155–56.) Local 1181 also met with auditors to review preliminary financial records for the Atlantic Express companies, Reliant Transportation, and Gotham Bus Company. (*Id.* at 153–55.)

On March 12, 2013, Local 1181 requested calculations of proposed savings from respondents' proposals and information on the number of employees who receive certain benefits. (GC Ex. 17.) The parties also made progress during the eleventh session on March 12, 2013, on issues such as wages, calculation of welfare and pension benefits during the strike, welfare and pension contributions, overtime, holiday pay, workday length, and employee certifications. (Tr. at 159–166.)

Finally, at the twelfth bargaining session on March 19, 2013, Local 1181 urged respondents to continue negotiating and to pay Easter adjustment checks. (*Id.* at 169.) Cordiello told the parties he believed an agreement could be reached due to the progress made over the last three sessions. (*Id.*) Local 1181 asked respondents to drop the MFN clause, and discussed wages, benefits, overtime, and route selection. (*Id.* at 171–73.)

After a caucus, respondents presented their best and final offer. (*Id.* at 176–77.) Pollack said the parties were at an impasse because Local 1181 would not agree to the MFN clause and the best and final offer would be implemented on March 22, 2013. (*Id.* at 179.) Although respondents had stressed the importance of the MFN clause during previous bargaining sessions, the parties had discussed the MFN clause throughout their sessions for a total of less than an hour. (*Id.* at 180–81.) Cordiello said he did not believe the parties were at an impasse and that the parties should continue to negotiate. (*Id.* at 180.) Cordiello also said Local 1181 would be willing to meet with a mediator. (*Id.*)

Respondents implemented their best and final offer on March 22, 2013. (*Id.* at 187–88; GC Ex. 20.) Under the best and final offer, respondents withheld Easter adjustment checks, cut wages for drivers by 7.5% and wages for escorts by 3.75% for those employees at top pay, enacted a three-month moratorium on welfare contributions, eliminated wage accruals (longevity pay), cut additional pay for employees who work on days that schools are closed, and eliminated adjustment weeks, daily overtime, and medical and pension contributions for employees on worker's compensation or disability leave. (*Id.* at 188–94; GC Ex. 20.)

### 4. Effects of Best and Final offer

Local 1181 members testified at the ALJ hearing that they were unhappy with Local 1181 for its inability to prevent the reductions and other cuts that resulted from the respondents' implementation of the best and final offer. (Tr. at 614–929.) Local 1181 members told one matron that the "union was weak." (*Id.* at 625.) Joseph Micciulli, a shop steward, testified that other employees frequently remark that the union is a joke. (*Id.* at 698.) Micciulli also testified that employees had prepared financially for the strike but not for the cuts resulting from the best and final offer. (*Id.* at 708–09.) Mario Jean, a bus driver and shop steward, testified that attendance at Local 1181 meetings had dropped from 3,000 in April 2013 to 150 in June 2013. (*Id.* at 848.)

Bus driver and shop steward Frederick Sinclair, who has daily contact with over three hundred employees, testified that 40% of the employees with whom he has contact made negative comments about Local 1181 since implementation of the best and final offer. (*Id.* at 903–904.) Local 1181 members also testified that union members are having trouble paying bills, (*id.* at 616), feared losing their homes, (*id.* at 752), were going bankrupt, (*id.* at 767), had trouble paying rent and tuition for their children, (*id.* at 805), and suffered from anxiety, (*id.* at 624), and depression, (*id.* at 617).

### DISCUSSION

#### A. Authority to Seek 10(j) Relief

■ As a preliminary matter, respondents argue that the NLRB is without power to act because it did not have a lawfully appointed quorum, and that petitioner thus lacks the legal authority to file either the consolidated complaint against respondents or the petition for 10(j) relief. (ECF No. 18, Answer, Third Party Complaint, and Counterclaim, 7/12/13; ECF No. 57, Memorandum in Opposition re: Motion to Dismiss for lack of Jurisdiction, 8/16/13; ECF No. 59, Respondents' Notice of Supplemental Authority, 8/21/13.) Respondents cite the recent decision in *Hooks v. Kitsap Tenant Support Servs.,* Case No. C13–5470, 2013 WL 4094344, 2013 U.S. Dist. LEXIS 114320 (W.D.Wash. Aug. 13, 2013), in which the court addressed the same arguments and held that the regional director in that case lacked authority and could not file a section 10(j) petition.

Two judges in the Eastern District of New York, however, have rejected similar arguments in *Paulsen v. Renaissance Equity Holdings, LLC,* 849 F.Supp.2d 335 (E.D.N.Y.2012), and *Paulsen v. Remington Lodging & Hospitality, LLC,* Case No. 13–cv–2539, 2013 WL 4119006, 2013 U.S. Dist. LEXIS 114628, (E.D.N.Y. Aug. 14, 2013). In *Renaissance Equity Holdings,* Judge Cogan held that Congress intended to permit the NLRB to delegate its section 10(j) powers to the General Counsel based on the legislative history of the Taft–Hartley Act, that the NLRB lawfully delegated its section 10(j) powers, and that because "Congress created the post of General Counsel to ensure that certain prosecutorial functions operate without regard to the [NLRB][,] [t]he General Counsel's validly-delegated power to initiate § 10(j) petitions therefore does not vanish when the [NLRB] loses its quorum." *Id.* at 345, 350; *see also Remington Lodging,* 2013 WL 4119006 at *7, 2013 U.S. Dist. LEXIS 114628 at *24. Because, under this analysis, the General Counsel has the authority to bring a section 10(j) petition regardless of whether President Obama's recess appointments to the NLRB are valid, it is unnecessary to address the constitutional question of whether those appointments were, in fact, valid. *Renaissance Equity Holdings,* 849 F.Supp.2d at 350–52; *Remington Lodging,* 2013 WL 4119006 at *7, 2013 U.S. Dist. LEXIS 114628 at *24. In *Remington Lodging,* Judge Bianco adopted Judge Cogan's reasoning on this issue and pointed out that numerous other courts have reached the same conclusion. *Remington Lodging,* 2013 WL 4119006 at *7–8, 2013 U.S. Dist. LEXIS at *24–25 (citing *Frankl v. HTH Corp.,* 650 F.3d 1334, 1347–54 (9th Cir.2011); *Overstreet v. SFTC, LLC,* 943 F.Supp.2d 1296, 1297–99, Case No. 13–CV–165, 2013 WL 1909154, at *1–2, 2013 U.S. Dist. LEXIS 66694, at *3–7 (D.N.M. May 9, 2013); *Calatrello v. JAG Healthcare, Inc.,* Case No. 12–CV–726, 2012 WL 4919808, at *3–4, 2012 U.S. Dist. LEXIS 148528, at *8–10 (N.D.Ohio Oct. 16, 2012); *Gottschalk v. Piggly Wiggly*

*Midwest, LLC,* 861 F.Supp.2d 962, 963–65 (E.D.Wis.2012)).

This court agrees with and adopts the thorough and persuasive reasoning of Judge Cogan, which was followed by Judge Bianco, and the many other courts that have addressed this issue, and finds that the NLRB has the authority to bring this section 10(j) action.

### B. Legal Standards for Section 10(j) Relief

■ Under section 10(j) of the Act, a federal district court may grant a preliminary injunction pending the NLRB's resolution of an unfair labor practice proceeding. 29 U.S.C. § 160(j).[1] "In this Circuit, in order to issue a § 10(j) injunction, the district court must apply a two-prong test. First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." *Hoffman v. Inn Credible Caterers, Ltd.,* 247 F.3d 360, 364–65 (2d Cir. 2001); *see also Mattina v. Kingsbridge Heights Rehab. & Care Ctr.,* 329 Fed. Appx. 319, 321 (2d Cir.2009) (same). The court considers these prongs in detail below.

#### 1. Reasonable Cause

■■ In deciding whether there is reasonable cause to believe that respondents committed an unfair labor practice, the "district court does not need to make a final determination whether the conduct in question constitutes an unfair labor practice; reasonable cause to support such a conclusion is sufficient." *Inn Credible Caterers,* 247 F.3d at 365. Instead, the district court should "show [a]ppropriate deference" to the NLRB's determination that reasonable cause exists. *Mattina,* 329 Fed.Appx. at 321 (internal quotation and citation omitted). The Second Circuit has directed that district courts give considerable deference to the NLRB in section 10(j) proceedings. "With respect to issues of fact, the Regional Director [of the NLRB] should be given the benefit of the doubt ... and on questions of law, the [NLRB's] view should be sustained unless the court is convinced that it is wrong." *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d 1047, 1051 (2d Cir.1980) (internal quotation and citation omitted); *see also Silverman v. Major League Baseball Player Relations Comm., Inc.,* 67 F.3d 1054, 1059 (2d Cir.1995) ("Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed."); *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1031 (2d Cir. 1980) ("[T]he Regional Director's version of the facts should be sustained if within the range of rationality ... [,] inferences from the facts should be drawn in favor of the charging party, and ... even on issues of law, the district court should be hospitable to the views of the General Counsel, however novel.") (internal quotation and citation omitted).

#### 2. Injunctive Relief

■ The Second Circuit has held that "some degree of deference is warranted

---

1. Section 10(j) states in relevant part: "The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States ... within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

when the Regional Director seeks an injunction" under section 10(j) and that "[s]uch deference is especially appropriate in section 10(j) cases when the prevailing legal standard is clear and the only dispute concerns the application of that standard to a particular set of facts." *Silverman v. 40–41 Realty Assocs., Inc.*, 668 F.2d 678, 681 (2d Cir.1982); *see also Fernbach v. Raz Dairy, Inc.*, 881 F.Supp.2d 452, 467 (S.D.N.Y.2012) (same). "In this Circuit, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Inn Credible Caterers*, 247 F.3d at 368. "While this standard preserves traditional equitable principles governing injunctive relief, [courts must be] mindful to apply them in the context of federal labor laws," specifically, to further the purposes of the Act. *Id.* (citing *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir.1975)).

■ The irreparable harm inquiry focuses on whether a "failure to preserve the status quo would bring irreparable harm to the employees' ability to exercise their collective bargaining rights" and leave in place a violation of the Act that "threaten[s] to render the [NLRB's] processes totally ineffective by undermining the force of its remedial power." *Id.* at 369; *see also Mattina*, 329 Fed.Appx. 319, 321 (2d Cir.2009) ("This Circuit has made clear that courts should grant interim relief under Section 10(j) in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress has sought to protect.") (internal quotation and citation omitted). The Second Circuit has explained that "the district court has the power to order immediate bargaining to prevent irreparable harm to the union's position in the [workplace], to the adjudicatory machinery of the NLRB, and to the policy of the [National Labor Relations] Act in favor of the free selection of collective bargaining representatives." *Inn Credible Caterers*, 247 F.3d at 368–69 (quoting *Seeler*, 517 F.2d at 39).

■ Consequently, "[i]n this Circuit, the appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred.... '[S]ection 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices.'" *Id.* at 369 (quoting *Seeler*, 517 F.2d at 38).

### 3. Unfair Labor Practice

■ Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed [under the Act.]" 29 U.S.C. § 158(a)(1). Furthermore, it is an unfair labor practice under Section 8(a)(5) of the Act for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). An employer may violate this section of the Act by either refusing to bargain or by failing to "bargain in good faith with unions 'with respect to wages, hours, and other terms and conditions of employment.'" *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 185 (2d Cir.1991) (quoting 29 U.S.C. § 158(d), or section 8(d) of the Act).

■ An employer who unilaterally changes the terms and conditions of a contract without bargaining in good faith violates sections 8(a)(1) and 8(a)(5) of the Act. *Unite Here v. NLRB*, 546 F.3d 239, 242 (2d Cir.2008); *see also NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) ("Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to

the congressional policy."). Thus, "[w]hen a collective agreement expires, an employer may not alter terms and conditions of employment involving mandatory subjects until it has bargained to an impasse over new terms." *Silverman,* 67 F.3d at 1059 (citing *Katz,* 369 U.S. at 741–43, 82 S.Ct. 1107).

#### a. Impasse

■■■ "It is well established that the existence of a valid impasse ... must be proved by the party asserting the right to act unilaterally." *L.W.D., Inc.,* 342 NLRB 965, 965 (2004); *e.g., CalMat Co.,* 331 NLRB 1084, 1097–98 (2000) (same). A party may "declare an impasse after the failure of sincere efforts to resolve the issue and to face the consequences," *NLRB v. Milgo Indus.,* 567 F.2d 540, 543 (2d Cir.1977), because the requirement to bargain in good faith "does not compel either party to agree to a proposal or to require the making of a concession ....[or] to engage in fruitless marathon discussions at the expense of frank statement and support of [its] position," *NLRB v. Am. Nat'l Ins. Co.,* 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952).

■■■ The NLRB has defined impasse as "the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile.... 'Both parties must believe that they are at the end of their rope.'" *Larsdale, Inc.,* 310 NLRB 1317, 1318 (1993) (quoting *Richmond Recording Corp.,* 280 NLRB 615, 635 (1986), *enforced* 836 F.2d 289 (7th Cir.1987)). To determine whether an impasse has occurred, the NLRB takes into account factors such as "[t]he bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the

parties as to the state of negotiations." *Taft Broad. Co.,* 163 NLRB 475, 478 (1967), *enforced sub nom. Am. Fed. of Television & Radio Artists v. NLRB,* 395 F.2d 622 (D.C.Cir.1968); *see also Laurel Bay Health & Rehab. Ctr. v. NLRB,* 666 F.3d 1365, 1373 (D.C.Cir.2012) (same).

■■■ The NLRB has "long distinguished between an impasse on a single issue that would not ordinarily suspend the duty to bargain on other issues and the situation in which impasse on a single critical issue creates a complete breakdown in the entire negotiations." *CalMat Co.,* 331 NLRB at 1097. Therefore, a party seeking to establish an impasse on a single critical issue must demonstrate the following three requirements:

> [F]irst, the actual existence of a good-faith bargaining impasse; second, that the issue as to which the parties are at impasse is a critical issue; third, that the impasse on this critical issue led to a breakdown in the overall negotiations— in short, that there can be no progress on any aspect of the negotiations until the impasse relating to the critical issue is resolved.

*Id.*

### C. Application

#### 1. Reasonable Cause

■■■ The first issue for the court is whether there is reasonable cause to believe that respondents prematurely declared impasse and implemented their best and final offer, thereby committing an unfair labor practice by violating their obligation to bargain in good faith with the union.

Respondents argue that the MFN clause was a critical issue, that the parties were at a good-faith bargaining impasse because they could not agree on the MFN clause, and that the impasse led to a breakdown in

the overall negotiations. Respondents assert the MFN clause was "critical to both parties," point to Cordiello's rejection of the MFN clause, claim that there was "simply no indication that either party would ever compromise on the MFN clause," and conclude that the negotiations "broke down over the MFN clause." (ECF No. 46, Post–Administrative Hearing Brief in Opposition ("Opp."), 8/5/13, at 18–19.)

There is no dispute that the MFN clause protects the financial interests of respondents by ensuring that they automatically receive the same terms Local 1181 negotiates with new bidders who are not obligated to pay the costs associated with EPPs. Petitioner concedes that "there is evidence that the MFN clause was a critical issue." (ECF No. 45, Memorandum in Support of Petition ("Mem."), 8/5/13, at 21.) Petitioner argues, however, that the parties had not reached a good-faith bargaining impasse and that there was no "breakdown" in the negotiations such that there could be no progress on any issue until the impasse related the MFN clause was resolved. (Id. at 20–21.) The record reveals that petitioner is correct.

First, the course of the negotiations establishes that there was no good-faith bargaining impasse. Although there were twelve negotiation sessions, only five sessions occurred after the conclusion of Local 1181's strike against the city, and there was movement during each of those negotiation sessions on important economic issues such as wages, welfare, pension, and benefit contributions, overtime, and holiday pay. (Tr. at 132–177.) The progress of negotiations demonstrates that both parties did *not* "believe that they [were] at the end of their rope," *Richmond Recording Corp.*, 280 NLRB at 635, and that "further bargaining would be futile," *Larsdale, Inc.*, 310 NLRB at 1318. Moreover,

Local 1181 had just begun reviewing financial records for a small number of respondent companies when respondents declared an impasse, and Local 1181 believed that additional review could have led to even more movement. (Tr. at 153–55.)

Moreover, any dismissive comments Cordiello may have made about the MFN clause must be viewed in the context of the 2009 negotiation between the parties. Cordiello had repeatedly rejected requests by Pollack to include the MFN clause during the negotiations for the 2009–2012 CBA. (Id. at 89–90.) On the last day of those negotiations, however, Cordiello agreed to include the MFN clause after securing other items from respondents. (Id.) This concession shows that the mere fact that Cordiello may have rejected the MFN clause during the recent bargaining sessions, even if he used colorful language to do so, does not necessarily mean that he would *never* consider the MFN clause or was unwilling to compromise on other aspects of the CBA. Indeed, when respondents declared an impasse, Cordiello responded that he did not agree that they were at an impasse because the parties had made progress on many other issues since the end of the strike, that the parties should continue to negotiate, and that Local 1181 would be willing to meet with a mediator. (Id. at 180.)

The vibrant bargaining and discussions during the five negotiation sessions after the strike also indicate that there was no "complete breakdown in the entire negotiations." *CalMat Co.*, 331 NLRB at 1087. Even though the MFN clause received scant discussion over the course of the negotiations, (Tr. at 180–81), there was substantial movement on important topics such as wages, benefits, and pensions, (id. at 159–177). This movement on issues other than the MFN clause shows that the

bargaining process was still viable when respondents declared an impasse.

Finally, respondents incorrectly attempt to analogize their bargaining in this case to *New NGC, Inc.*, 359 NLRB No. 116, 2013 WL 1873273 (May 3, 2013). But this case is distinguishable from *New NGC* for several reasons. In *New NGC*, the company had rejected a proposal by the union to offer certain economic concessions in return for the company's withdrawal of its pension and 401(k) proposals "and gave no indication that it would accept any concessions in return." *New NGC*, 2013 WL 1873273 at *1. By contrast, in the instant action, there is no indication in the record that the parties had ever discussed the MFN clause in depth, seriously bargained over the MFN clause, or offered any significant concessions in exchange for the inclusion or exclusion of the MFN clause. In fact, the parties had spent a total of less than an hour discussing the MFN clause throughout their twelve bargaining sessions. (Tr. at 180–81, 513.)

Second, in *New NGC*, an important union representative spoke at length against the company's proposals at another negotiation session, calling them "wrong," "shortsighted," "self-destructive," and "an attack on the middle class" and stated that he wanted to "reverse the trend" of accepting such changes to pension and 401(k) plans. *New NGC*, 2013 WL 1873273 at *1. After the representative left, the union negotiator informed the company that those statements "represented the [u]nion's position." *Id.*

In the instant negotiations, although Cordiello rejected the MFN clause, (Tr. at 132), and criticized the MFN clause, allegedly saying at one point that "never in a million years will you ever get this," (*id.* at 1022), such remarks must be viewed in light of the bargaining history of the parties. Cordiello had also repeatedly reject-ed the MFN clause during the 2009 negotiations, only to accept the clause during the last session after receiving other concessions. (*Id.* at 89–90.) When Cordiello's remarks are viewed in this context with appropriate deference to the N.L.R.B., they appear to be part of the puffery and posturing attendant to the bargaining process, not an absolute, fixed union policy statement.

Further, the record indicates that Cordiello was not unambiguously opposed to the MFN clause throughout these negotiations. The MFN clause in the 2009–2012 CBA contained a sunset provision under which it expired on December 31, 2012. (GC Ex. 2 at Section 51.) Cordiello proposed extending the CBA for a year *with* the MFN clause at the November 20, 2012 session, but respondents rejected his proposal. (Tr. at 103–04). The union's offer to extend the 2009–2012 CBA with the MFN clause suggests there was leeway for the parties to continue negotiations, including over the MFN clause, up to the time the respondents declared impasse. This is an important distinction from the union's position in *New NGC*.

For the foregoing reasons, the court finds that there is reasonable cause to believe that respondents did not bargain in good faith and violated sections 8(a)(1) and 8(a)(5) of the Act by prematurely declaring an impasse and unilaterally implementing their best and final offer.

### 2. Injunctive Relief

■ The second issue for the court is whether petitioner has demonstrated that injunctive relief is just and proper in this case because it is needed to prevent "irreparable harm to the employees' ability to exercise their collective bargaining rights." *Inn Credible Caterers*, 247 F.3d at 369.

Petitioner argues that injunctive relief is necessary because "employee support for

the [u]nion will predictably erode" if the union is viewed as incapable of protecting employees "or affect[ing] their working conditions through collective bargaining" while the case is pending before the NLRB. (Mem. at 23.) Based on testimony from Local 1181 members, petitioner argues that "the halt in the negotiations has already caused deep frustration and anger among the employees." (*Id.* at 24.) Petitioner claims Local 1181 members will shun the union while this case is pending and that, by the time the NLRB issues its final bargaining order, the union will have lost too much support to be relevant and effective. (*Id.*) Petitioner also argues that the unilateral changes implemented as a result of respondents' best and final offer allow respondents "to enjoy the fruits of its unlawful conduct and gain an undue bargaining advantage." (*Id.* at 25.) Finally, petitioner argues that interim relief is in the public interest because it will preserve the NLRB's remedial power and that respondents have failed to support their claim that they may go out of business if forced to rescind the changes. (*Id.* at 28–29.)

Respondents argue that, even if they unlawfully declared impasse and implemented their best and final offer, injunctive relief is unnecessary because money damages are an adequate remedy. (Opp. at 22.) Respondents also argue that "if a court were to order the [e]mployers to revert to their pre-impasse economic package, that very well could force some of the [e]mployers into bankruptcy." (*Id.* at 25.) Finally, respondents argue that, even if union membership is eroding, this loss of support was caused by Local 1181's decision to strike, not by the implementation of the best and final offer. (*Id.* at 26.)

The evidence in the record establishes that respondents' unilateral implementation of their best and final offer imposes significant ongoing financial hardships on Local 1181 members that money damages paid after a final decision will not adequately remedy. Respondents used the best and final offer to cut wages for drivers by 7.5% and wages for escorts by 3.75% for those employees at top pay, enacted a three-month moratorium on welfare contributions, eliminated wage accruals (longevity pay), cut additional pay for employees who work on days that schools are closed, and eliminated adjustment weeks, daily overtime, and medical and pension contributions for employees on worker's compensation or disability leave. (Tr. at 189–94; GC Ex. 20.) Local 1181 employee-representatives offered testimony at the ALJ hearing that union members are having trouble paying bills, (Tr. at 616), feared losing their homes, (*id.* at 752), were going bankrupt, (*id.* at 767), had trouble paying tuition for their children, (*id.* at 805), and were experiencing anxiety, (*id.* at 624), and depression, (*id.* at 617). These types of *ongoing* financial and emotional hardships to the union members, and their resulting antagonism toward the union cause by the implementation of the best and final offer, adversely affects the union's ability to protect the collective bargaining rights of its members and cannot be remedied by money damages awarded only after a final decision. *See Blyer v. Jung Sun Laundry Group Corp.*, Case No. 10–cv–2975, 2010 WL 4722286, at *9, 2010 U.S. Dist. LEXIS 120565, at *26–27 (E.D.N.Y. Nov. 15, 2010) (holding that injunctive relief was appropriate because employees would have difficulty paying rent and medical bills and that "[n]o future administrative order can remedy this problem").

The testimony from Local 1181 members at the ALJ hearing provides evidence of the growing frustration of members at the union's inability to prevent respondents' unilateral cuts. (Tr. at 614–929.)

Although some of this anger may stem from the union's decision to strike, based on the testimony at the hearing, it is reasonable for petitioner to assert that union members also blame Local 1181 for failing to preserve their economic well-being through the collective bargaining process.

The Second Circuit has stated that "unilateral action 'detracts from the legitimacy of the collective bargaining process by impairing the union's ability to function effectively, and by giving the impression to members that a union is powerless.'" *NLRB v. WPIX, Inc.*, 906 F.2d 898, 901 (2d Cir.1990) (quoting *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 64–65 (2d Cir.1979)); *see also Katz*, 369 U.S. at 747, 82 S.Ct. 1107 ("Unilateral action by an employer ... must of necessity obstruct bargaining, contrary to the congressional policy."); *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385, 66 S.Ct. 203, 90 L.Ed. 145 (1945) (unilateral action tells employees that "there is no necessity for a collective bargaining agent"). Moreover, "[a]s other courts in this Circuit have noted, employee support for a union is likely to erode the longer it remains absent from the collective bargaining process." *Mattina v. Chinatown Carting Corp.*, 290 F.Supp.2d 386, 394 (S.D.N.Y.2003); *see also Frankl*, 650 F.3d at 1363 ("even if the [NLRB] subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties"); *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C.Cir.1970) ("When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees."). Therefore, because union members are likely blaming Local 1181 for being unable to prevent the financial and emotional harm they are experiencing as a result of the best and final offer, consequently threatening the union with the loss of membership and bargaining clout, injunctive relief is necessary to "prevent irreparable harm to the union's position in the [workplace]." *Inn Credible Caterers*, 247 F.3d at 368.

Interim rescission is also necessary to prevent respondents from being able to use restoration of the status quo as a bargaining tool in negotiations, further impairing the union's collective bargaining position. *See Harrell v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 558 (7th Cir.2013) ("putting the union in the position of needing to 'bargain back' these conditions is often the Respondent's goal, thereby changing the status quo and forcing the union to bargain for previously attained rights"). Restoration of the status quo, however, ensures "meaningful bargaining." *Sw. Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir.1988); *see also Kreisberg v. HealthBridge Mgmt., LLC*, 2012 WL 6553103, at *10, 2012 U.S. Dist. LEXIS 177699, at *33–34 (D.Conn. Dec. 14, 2012) ("making meaningful collective bargaining impossible and effectively rewarding [r]espondents for their unfair labor practices .... are exactly the harms the 10(j) mechanism was designed to prevent").

Respondents argue that they will incur serious financial harm if injunctive relief is granted, resulting in the layoffs of Local 1181 members and the resulting transportation of children by less experienced employees. (ECF No. 50, Respondents' Memorandum in Further Opposition to the Petition, 8/12/13, at 28.) Respondents claim these consequences will hurt the public interest and that the balance of the equities thus favors denying injunctive relief. (*Id.*) Although it is reasonable to assume that the city's bidding of contracts and increased competition may result in

reduced revenues for respondents, respondents have not proffered sufficient evidence to demonstrate that many of them will go out of business and be forced to lay off numerous workers who will not be hired by other competing companies. (*Id.*) Indeed, only a small number of respondents have even allowed Local 1181 to review financial information. (Tr. at 153–54.)

On the other hand, there is a strong public interest in "prevent[ing] irreparable harm to the union's position in the [workplace]." *Inn Credible Caterers*, 247 F.3d at 368. Because Local 1181 members are incurring ongoing financial and emotional harm, which in turn damages the union and the collective bargaining process, (Tr. at 614–929), the public interest and the balance of the equities in this case will be served by granting the injunctive relief sought by petitioner, and "restoring the status quo as it existed before the onset of unfair labor practices." *Inn Credible Caterers*, 247 F.3d at 369 (internal quotation and citation omitted); *see also Chinatown Carting*, 290 F.Supp.2d at 395 (ordering section 10(j) injunctive relief because "further delay adversely effects the financial situation of the discharged employees" and that the court "need find only that the public interest will not be adversely affected by the granting of the injunction") (internal quotation and citation omitted).

### CONCLUSION

For the foregoing reasons, the court finds that petitioner has shown that there is reasonable cause to believe that respondents have committed an unfair labor practice and that injunctive relief is just and proper. Accordingly, the court issues a preliminary injunction pursuant to section 10(j) ORDERING that respondents, their officers, agents, representatives, servants, employees, attorneys, and all members and persons acting in concert or participation with them, are enjoined and restrained, pending the final disposition of the matters involved herein pending before the NLRB from:

(1) Failing and refusing to bargain in good faith with Local 1181 by declaring impasse prematurely and by failing and refusing to bargain;

(2) Unilaterally imposing or changing the terms and conditions of employment of the bargaining unit employees, including but not limited to those terms and conditions in the most recent expired CBA of the parties, in the absence of a valid impasse; and

(3) In any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by section 7 of the Act.

Further, respondents, their officers, agents, representative, servants, employees, attorneys, successors, and assigns, and all persons acting in concert or participation with them, their officers, agents, and representatives shall:

(1) On a prospective basis, restore to the bargaining unit employees the terms and conditions of employment that were in effect prior to the unilateral changes respondents effectuated after the expiration of the CBA that expired on December 31, 2012, and continue those in effect until the parties reach an agreement or good faith bargaining impasse;

(2) Bargain collectively and in good faith with Local 1181 as the exclusive representative of the employees concerning wages, hours, and other terms and conditions of employment and, if an understanding is reached, embody it in a signed agreement;

(3) Within twenty (20) days of the issuance of this Memorandum & Order, counsel for respondents shall file with the court and serve upon petitioner a status report describing with specificity how respondents have complied with this Order, and certifying that all respondents have complied with this Order.

**SO ORDERED.**